[Cite as *In re D.M.S.*, 2021-Ohio-1214.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

IN RE: D.M.S

:
:
:     Appellate Case No. 28783
:
:     Trial Court Case No. 2019-5809
:
:     (Appeal from Common Pleas Court-
:     Juvenile Division)
:
:

. . . . . . . . . . .

O P I N I O N

Rendered on the 9th day of April, 2021.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by HEATHER N. KETTER, Atty. Reg. No. 0084470, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellant

JON PAUL RION, Atty. Reg. No. 0067020 and CATHERINE H. BREAULT, Atty. Reg. No. 0098433 , 130 West Second Street, Suite 2150, Dayton, Ohio 45402
    Attorneys for Defendant-Appellee

. . . . . . . . . . . . .

TUCKER, P.J.

**{¶ 1}** The State of Ohio appeals from the order of the Montgomery County Court of Common Pleas, Juvenile Division, which concluded that the State had not established probable cause that D.M.S. had committed an offense which, if committed by an adult, would constitute reckless homicide. For the following reasons, we reverse and remand.

## I.        Facts and Procedural History

**{¶ 2}** On Friday, December 13, 2019, D.M.S. and Jarell Roberts arrived at the apartment of their friend, Noah Channell, between 4:00 and 5:00 p.m. The three young men were "hanging out," discussing their plans for the night, and smoking marijuana. At approximately 6:00 p.m., D.M.S. and another friend, D.P.C., began a video FaceTime call. During the call, D.P.C. observed D.M.S. waving a handgun.[1] He also observed D.M.S. pull back the slide on the gun. At some point, D.M.S. turned his cellular telephone around so that D.P.C. could see what D.M.S. was observing. D.P.C. described what he saw as being akin to a first person video game. D.P.C. could see that D.M.S. was holding his gun directly under his telephone in such a manner that D.P.C. could see the barrel of the gun and the direction in which it was aimed. D.P.C. observed D.M.S. point the gun at Channell. He also saw Channell rise out of his chair, then heard a bang and saw a white flash. D.P.C. testified that the screen then went dark, and he heard D.M.S. say, "Noah," and "oh no."

**{¶ 3}** Kettering Police Officer Devin Maloney responded to Channell's apartment following a report of a shooting. When he entered the apartment, he observed Channell

---

[1] The handgun was identified as a Taurus 9mm Luger; it had a magazine which contained 11 bullets. In order to load a bullet into the chamber, the slide on top of the gun had to be "racked," or pulled.

on the floor in the doorway connecting the dining and living rooms. Maloney also observed two other young men in the dining room. Maloney observed a gun on a shelf that was just below his eye level.

{¶ 4} According to Maloney, D.M.S. was highly emotional, crying, and yelling. When Maloney asked him what had occurred, D.M.S. made a motion like he was pulling a slide on a gun. D.M.S. then pulled his arm backward as if demonstrating a recoil after firing. D.M.S. then stated, "it just went off." Tr. p. 59. Prior to that moment, Maloney had believed Channell's injury had been self-inflicted.

{¶ 5} Maloney took D.M.S. outside, at which time a neighbor with a cellular telephone approached. The neighbor handed the telephone to D.M.S. and indicated that Channell's mother was on the telephone. Maloney heard D.M.S. say "he was sorry and that Noah was shot." Tr. p. 62. Maloney then took the telephone and informed Channell's mother that her son was being transported to the hospital. Another officer placed D.M.S. into a cruiser. Maloney then met Channell's father who had just arrived home; Maloney informed him about the shooting and that Channell was being transported to a hospital. Maloney then went to Miami Valley Hospital, where he learned that Channell had died.

{¶ 6} D.M.S. was taken to the police department where he was interviewed by Kettering Detective Douglas Kowalski. Initially, D.M.S. told Kowalski that he had had the gun in his waistband. He indicated he removed it and was laying it on the dining room table when it discharged and struck Channell, who was on the opposite side of the dining room table. D.M.S. stated he did not think his finger had been on the trigger. D.M.S. would not discuss how he obtained the gun but indicated he had it for protection. D.M.S.

stated the gun's magazine had 11 bullets, but a bullet was in the chamber. He further indicated he knew how to handle and use a gun because he had been to a shooting range when he was younger. At that point, Kowalski halted the interview in order to speak with D.P.C.

{¶ 7} When Kowalski returned to the interview room, he confronted D.M.S. with D.P.C.'s statement that D.M.S. had been playing with the gun, had pointed it at both Channell and Roberts, and had pulled the gun's trigger. At this point, D.M.S. admitted his actions were similar to playing a video game called "Call of Duty," which Kowalski described as a first-person shooting game in which the player has the viewpoint of a video character. D.M.S. admitted he was playing with the gun while on the telephone with D.P.C., but stated the magazine was not in the gun when he pointed it at his friends and pulled back the slide. He insisted he had double-checked to make sure the magazine was not in the gun, and he did not pull the trigger when aiming at Channell. D.M.S. indicated that he then reinserted the magazine and placed the gun into his waistband. D.M.S. claimed he then pulled the gun out of his waistband and was placing it on the table when it discharged. D.M.S. stated he did not know how a bullet was inserted into the gun's chamber and then, contrary to his earlier statement, indicated he was not sure how guns work.

{¶ 8} Kowalski again halted the interview in order to speak with other officers about the shooting. He then returned to the interview room and informed D.M.S. that D.P.C. saw D.M.S. point the gun at Channell and pull the trigger. D.P.C. also heard a loud bang and observed a white flash. At this point, D.M.S. "indicated that if that's the way that it was described, then that may have been the way that it happened." Tr. p. 95.

{¶ 9} A delinquency complaint was filed in the juvenile court alleging that D.M.S. committed an offense that would constitute reckless homicide if committed by an adult. The State subsequently amended the complaint to add a firearm specification to the charge of reckless homicide. The State also filed a motion for a discretionary bindover to transfer jurisdiction of the case to the common pleas court's general division so that D.M.S. could be prosecuted as an adult.

{¶ 10} The juvenile court conducted a hearing on probable cause during which the above-cited evidence was introduced. The State and D.M.S. stipulated that he was age 17 at the time of the offense.

{¶ 11} After the hearing on the State's motion, the juvenile court found there was not probable cause to find that D.M.S. had committed the act charged. In so finding, the court stated:

> The State argues that "a defendant may be guilty of reckless homicide for an unintentional shooting if the evidence supports a finding that he handled a firearm in a reckless manner, resulting in another person's death. * * * D.M.S. asks the Court to consider O.R.C. 2903.05 and the legislative intent behind that statute.
>
> O.R.C. 2903.05(A) directs that "no person shall negligently cause the death of another * * * by means of a deadly weapon or dangerous ordinance." It is well established that "[a] person acts negligently when because of a substantial lapse from due care, the person fails to perceive or avoid a risk that the person's conduct may cause a certain result or may be of a certain nature. A person is negligent with respect to circumstances

when, because of a substantial lapse from due care, the person fails to perceive or avoid a risk that such circumstances may exist." O.R.C. 2901.22(D). The legislative intent behind O.R.C. 2903.05 was to address "the person who points a firearm in jest and kills the unfortunate at whom it is aimed." *1974 Committee Comment to H511*.

The distinction between reckless homicide and negligent homicide is whether the defendant acted with heedless indifference to [the consequences], disregarding a substantial and unjustifiable risk, or whether a defendant failed to perceive or avoid a risk due to a substantial lapse of due care.

The Court has carefully and fully considered the evidence presented, as well as the arguments of the parties, and is simply unable to find the State sufficiently proved that D.M.S. acted with heedless indifference to consequences while disregarding a substantial and unjustifiable risk. The State has failed to contradict the testimony of D.M.S. that he had removed the clip from the gun before he began playing with it and further did not believe that there was a bullet in the chamber of the gun. The evidence further indicated that on the evening of December 13, 2019, D.M.S. was unsure how the weapon discharged. While the events of December 13, 2019, were undeniably catastrophic and heartbreaking, the Court cannot find that a person who accidentally shot another with a gun that he believed to be unloaded by his own hand and therefore harmless acted with heedless indifference to consequences while disregarding a substantial and

unjustifiable risk.

Order (Mar. 27, 2020).

{¶ 12} The court thus denied the state's discretionary bindover motion.

{¶ 13} The State appeals.

## II.    Probable Cause Analysis

{¶ 14} The State's sole assignment of error states as follows:

D.M.S.'S IRRESPONSIBLE USE OF A LOADED GUN AND AIMING IT AT NOAH CHANNELL, ALONG WITH D.M.S.'S PRIOR EXPERIENCE OF FIRING GUNS, UNDERMINES THE TRIAL COURT'S FINDING THAT THE STATE FAILED TO ESTABLISH PROBABLE CAUSE TO BELIEVE THAT D.M.S. RECKLESSLY KILLED NOAH CHANNELL.   THE TRIAL COURT ERRED, THEREFORE, IN NOT FINDING PROBABLE CAUSE.

{¶ 15} In challenging the juvenile court's judgment, the State asserts it presented credible evidence of every element of the offense of reckless homicide to support a finding of probable cause to believe that D.M.S. committed an act which, if committed by an adult, would constitute the offense of reckless homicide.

{¶ 16} "A 'delinquent' child is one who violates any federal or state law or ordinance of a political subdivision, other than a juvenile traffic offender, if the act would be an offense if committed by an adult."   *Steele v. Harris*, 161 Ohio St.3d 407, 2020-Ohio-5480, 163 N.E.3d 565, ¶ 9, citing R.C. 2151.011(B)(12) and R.C. 2152.02(E)(1).   Juvenile courts possess exclusive jurisdiction over children alleged to be delinquent. *Id.*, citing R.C. 2151.23(A)(1); *In re M.P.,* 124 Ohio St.3d 445, 2010-Ohio-599, 923 N.E.2d 584, ¶ 11.

However, "[i]f a child is old enough and is alleged to have committed an act that would be a felony if committed by an adult, the juvenile court may transfer its jurisdiction to the appropriate adult court for criminal prosecution ('a discretionary transfer') or may be required to transfer jurisdiction ('a mandatory transfer')." *Steele* at ¶ 10. " 'Mandatory transfer removes discretion from judges in the transfer decision in certain situations.' * * * 'Discretionary transfer, as its name implies, allows judges the discretion to transfer or bind over to adult court certain juveniles who do not appear to be amenable to care or rehabilitation within the juvenile system or appear to be a threat to public safety.' " *State v. D.W.*, 133 Ohio St.3d 434, 2012-Ohio-4544, 978 N.E.2d 894, ¶ 10, quoting *State v. Hanning*, 89 Ohio St.3d 86, 90, 728 N.E.2d 1059 (2000); R.C. 2152.12(A) and (B). "Whether an alleged offender is subject to mandatory or discretionary transfer depends on such factors as the nature of the offense, the age of the child, and the child's prior criminal history, if any." *Harris* at ¶ 10. "These transfers occur through a statutory process that 'is generally referred to as a bindover procedure.' " *Id.*, quoting *State v. Wilson*, 73 Ohio St.3d 40, 43, 652 N.E.2d 196 (1995).

{¶ 17} Juv.R. 30(A) provides that, upon a motion to transfer jurisdiction, the juvenile court "shall hold a preliminary hearing to determine if there is probable cause to believe that the child committed the act alleged and that the act would be an offense if committed by an adult." If probable cause is established, the juvenile court then proceeds differently depending on whether the transfer is mandatory or discretionary. *See M.P.* at ¶ 11-12. If a child is subject to mandatory bindover, and the court finds "probable cause exists to believe that the juvenile did commit the acts charged, the only procedural step remaining is for the court to enter the order of transfer." *Id.* at ¶ 11;

Juv.R. 30(B). In contrast, in a discretionary bindover, after determining the child is at least 14 years old and that probable cause has been established, the court "shall continue the proceeding for full investigation. The investigation shall include a mental examination of the child by a public or private agency or by a person qualified to make the examination. When the investigation is completed, an amenability hearing shall be held to determine whether to transfer jurisdiction. The criteria for transfer shall be as provided by statute." Juv.R. 30(C); *M.P.* at ¶ 12.

{¶ 18} Because D.M.S. was 17 years old at the time of his offense and did not fall within any of the mandatory transfer provisions in R.C. 2152.10(A)(1)-(3) or R.C. 2152.12(A), his transfer was discretionary and fell under the auspices of R.C. 2152.10(B) and R.C. 2152.12(B). The court did not conduct an investigation or amenability hearing because it concluded the State had failed to establish probable cause. We are asked to determine whether that conclusion was erroneous.

{¶ 19} "[The] probable cause hearing held before a juvenile [is] transfer[red] to adult court is a preliminary, non-adjudicatory proceeding[.]" *State v. Starling*, 2d Dist. Clark No. 2018-CA-34, 2019-Ohio-1478, ¶ 26, quoting *In the Matter of B.W.*, 2017-Ohio-9220, 103 N.E.3d 266, ¶ 18 (7th Dist.), citing *Breed v. Jones*, 421 U.S. 519, 95 S.Ct. 1779, 44 L.Ed.2d 346 (1975), fn. 18, and *State v. Carmichael*, 35 Ohio St.2d 1, 7-8, 298 N.E.2d 568 (1973). "This proceeding is non-adjudicatory because 'the juvenile court's function is not to determine whether the juvenile is guilty of the charge[,] but is to determine whether there is probable cause to believe the juvenile is guilty.' " (Emphasis omitted.) *Id.*, quoting *B.W.* at ¶ 18, citing *State v. Iacona*, 93 Ohio St.3d 83, 93, 752 N.E.2d 937 (2001). To establish probable cause, the State "must present 'evidence that

raises more than a mere suspicion of guilt," but need not produce evidence proving guilt beyond a reasonable doubt." *B.W.* at ¶ 20, citing *In re A.J.S.*, 120 Ohio St.3d 185, 2008-Ohio-5307, 897 N.E.2d 629, ¶ 41. "The evidence presented at the probable cause hearing 'does not have to be unassailable' to qualify as credible." *Id.* at ¶ 21, quoting *A.J.S.* at ¶ 46, citing *Iacona* at 93.

{¶ 20} The Ohio Supreme Court of Ohio has explained the role of the juvenile court in considering the evidence presented at a probable cause hearing:

> * * * "[I]n determining the existence of probable cause the juvenile court must evaluate the quality of the evidence presented by the state in support of probable cause *as well as* any evidence presented by the respondent that attacks probable cause." (Emphasis added.) [*Iacona* at 93], citing *Kent v. United States*, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966). Nonetheless, we expressly limited the court's review of the evidence presented at the bindover hearing, stating: "*Determination of the merits of the competing prosecution and defense theories, both of which [are] credible, ultimately [is] a matter for the factfinder at trial.*" (Emphasis added.) *Id.* * * *
>
> Thus, while the juvenile court has a duty to assess the credibility of the evidence and to determine whether the state has presented credible evidence going to each element of the charged offense, it is not permitted to exceed the limited scope of the bindover hearing or to assume the role of the ultimate fact-finder.

*A.J.S.* at ¶ 43-44.

{¶ 21} "A juvenile court's probable-cause determination involves both questions of fact and law.   In our review, we defer to the juvenile court's credibility determinations, but we review de novo whether the state presented sufficient evidence to demonstrate probable cause that the juvenile had committed the offense charged."   *State v. Dawson*, 1st Dist. Hamilton No. C-130765, 2015-Ohio-488, ¶ 9, citing *State v. Washington*, 1st Dist. Hamilton No. C130213, 2014-Ohio-4178, ¶ 13; *State v. E.T.*, 2019-Ohio-1204, 134 N.E.3d 741, ¶ 33 (10th Dist.).   *Accord In re D.M.S.*, 2d Dist. Montgomery No. 28783, 2020-Ohio-7028, ¶ 7.   *See also*, *M.P.*, 124 Ohio St.3d 445, 2010-Ohio-599, 923 N.E.2d 584, ¶ 13.

{¶ 22} D.M.S. was alleged to have committed reckless homicide in violation of R.C. 2903.041(A), which provides that "[n]o person shall recklessly cause the death of another * * *."   "A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature.   A person is reckless with respect to circumstances when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that such circumstances are likely to exist."   R.C. 2901.22(C).   "Substantial risk" is defined as "a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist."   R.C. 2901.01(A)(8).

{¶ 23} The juvenile court found that the State had failed to contradict evidence that D.M.S. removed the magazine from the gun before "goofing off" with it.   The court further found there was nothing presented to disprove D.M.S.'s claim he did not think there was a bullet in the chamber.   Finally, the court noted D.M.S. was unsure how the gun

discharged. Thus, the court found that the evidence, at most, established that D.M.S. had acted negligently. We disagree.

{¶ 24} In *State v. Peck*, 172 Ohio App.3d 25, 2007-Ohio-2730, 872 N.E.2d 1263 (10th Dist.), the Tenth District Court of Appeals held that "[a] mere failure to perceive or avoid a risk, because of a lack of due care, does not constitute reckless conduct." *Id.* at ¶ 12. In order to be reckless, "one must recognize the risk of the conduct and proceed with a perverse disregard for that risk." *Id.* The court went on to explain:

> In contrast to the actor who proceeds with knowledge of a risk, the failure of a person to perceive or avoid a risk that his conduct may cause a certain result or may be of a certain nature is negligence. R.C. 2901.22(D). Recklessness requires more than ordinary negligent conduct. The difference between the terms "recklessly" and "negligently" is normally one of * * * kind, rather than of * * * degree. "Each actor creates a risk of harm. The reckless actor is aware of the risk and disregards it; the negligent actor is not aware of the risk but should have been aware of it." Wharton's Criminal Law, 15th Ed., Section 27, at 170; see, also, *State v. Wall*, (S.D. 1992), 481 N.W.2d 259, 262.

*Id.* at ¶ 13.

{¶ 25} In *State v. Erby*, 2d Dist. Montgomery No. 27799, 2018-Ohio-3695, this court analyzed the defendant's claim that he did not act recklessly when he shot and killed his girlfriend.[2] In *Erby*, the following facts were adduced:

---

[2] *Erby* involved a question of whether the State presented sufficient evidence to establish reckless homicide. However, a finding of sufficient evidence necessarily establishes a finding of probable cause.

Erby said that he was lying in bed with McKee when, through his bedroom window, he saw two unknown males standing in the front yard. He left the bed and removed a .380 caliber semi-automatic handgun from his bedroom nightstand where he had stored it, wrapped in a blue bandana, since purchasing it three months earlier. Erby said that he previously had never fired the gun and had no formal firearms training, but had done internet research to try to learn enough to avoid hurting himself. He walked to the front door, which he opened when someone knocked. There he saw a third unknown male, to whom he displayed the gun, believing that the three men were planning a burglary. All three men fled on foot.

According to Erby, he locked the front door and returned to his bedroom in a "hyped up" state. McKee remained on the bed, lying on her right side with her left side exposed. Erby walked toward the nightstand to return the gun, "waving" it as he explained to McKee what had happened. With the gun in his right hand and his finger on the trigger, the gun discharged, hitting McKee. [Erby's] written statement said, "I was hyped up, waving my gun, and accidentally shot her."

*Id.* at ¶ 6-7.

**{¶ 26}** In concluding there was sufficient evidence to convict Erby of reckless homicide, this court explained that "a defendant may be guilty of reckless homicide for an unintentional shooting if the evidence supports a finding that he handled a firearm in a reckless manner, resulting in another person's death." (Citations omitted.) *Id.* at ¶ 20. In reaching this conclusion, we stated:

* * * Erby admitted to police both that he knew his handgun was loaded and that he was "waving" it in McKee's vicinity, with his finger on the trigger. Furthermore, the parties stipulated that the forensic pathologist who conducted McKee's autopsy would testify that the bullet that killed McKee was fired from "between 18 and 24 inches" from her arm, and that the forensic firearms expert who examined Erby's gun would testify that it was operable, had no internal defects or malfunctioning components, did not discharge when drop tested, and had fired the bullet that killed McKee.

Given those undisputed facts, the trial court had a reasonable basis for finding that Erby acted recklessly by "waving" what he knew to be a loaded gun within two feet of where McKee was lying on the bed, with his finger on the trigger while he was in an admittedly "hyped up" state. " '[A] firearm is an inherently dangerous instrumentality, the use of which is reasonably likely to produce death' when fired at an individual." [*State v.*] *English*, [10th Dist. Franklin No. 13AP-88, 2014-Ohio-89,] ¶ 11, quoting *State v. Widner*, 69 Ohio St.2d 267, 270, 431 N.E.2d 1025 (1982). Although Erby claimed to have believed that the gun's safety was in place, evidence that he handled an inherently dangerous and lethal weapon in the manner he himself described was sufficient to support his reckless homicide conviction.

Moreover, Erby's additional admission that he had very limited familiarity with the weapon he was so handling, having never before fired it or completed any formal firearms training, would further support the trial

court's conclusion that he acted recklessly. The defendant in *English* likewise admitted "that he did not have any experience with shotguns or any other firearms" before accidentally killing a person standing near where he was toying with a loaded weapon. *Id.* The Tenth District Court of Appeals concluded that "messing with" the shotgun's hammer despite his "lack of knowledge" was further evidence that defendant English acted recklessly, even though he was unsure if the gun was loaded. *Id.* Here, where Erby knew that the gun with which he was gesturing was loaded, a finding that he acted recklessly would be even more compelling.

*Id.* at ¶ 22-24. *See also State v. G.G.*, 10th Dist. Franklin No. 12AP-188, 2012-Ohio-5902, ¶ 14 ("A known risk of handling and manipulating a gun while standing in very close proximity to a child and while pointing it in the direction of that child, without checking the chamber to see if a bullet is still in the firearm, is that the firearm will discharge in the direction of the child, and the bullet will narrowly miss that child.").

{¶ 27} In this case, the State presented evidence that, prior to the shooting, D.M.S. had smoked marijuana, and that he had a gun which had a magazine with 11 bullets. While he was on a video call with D.P.C., D.M.S. pulled the slide on the gun. He also used the gun and his cellular telephone to simulate a first-player shooting game during which he pointed the gun at both of his friends. As he pointed the gun at Channell, it discharged. The evidence demonstrated Channell and D.M.S. were within a few feet of each other at the time of the shooting.

{¶ 28} During the first portion of his custodial interview, D.M.S. indicated he knew how to handle and use a gun and had been to a shooting range in the past. However,

he stated he did not know whether the gun was "cocked" or whether his finger was on the trigger when the gun discharged. He insisted he did not pull the slide and did not "rack" a bullet into the chamber. Instead, he stated he merely took the gun out of his waistband and was laying it on the table when it discharged.

{¶ 29} During the second portion of the interview, D.M.S. stated he knew not to play with firearms and that he had the gun for "protection." When informed D.P.C. had informed the police that D.M.S. had been "goofing off with the gun," and playing "Call of Duty," D.M.S. admitted he had showed the gun on camera but claimed he was not "goofing around" when the gun discharged. When asked if he "racked" the gun, D.M.S. stated he did so twice. He also stated that after he racked the gun, he pulled the trigger once while he was holding the hammer. He insisted the magazine was not in the gun at that time and he did not know how the bullet was inserted into the chamber. D.M.S. then stated he was not sure how guns work. He also stated he double-checked to ensure the magazine was not in the gun when he was "goofing around." D.M.S. stated when he finished playing with the gun, he put the clip back in the gun and placed it in his waistband; he then took the gun out of his waistband and laid it on the table, at which point it discharged.

{¶ 30} During the third portion of the interview, Kowalski told D.M.S. that D.P.C. indicated D.M.S. was actively playing with the gun and pointing it at Channel when it discharged. D.M.S. stated that was "a possibility." A few moments later he indicated D.P.C. had no reason to lie and that it must have happened in the manner D.P.C. described.

{¶ 31} Importantly, D.M.S. indicated he simply was not sure how the shooting had

occurred, and he admitted that D.P.C. had no reason to lie when he said D.M.S was playing with and pointing the gun at Channell when it fired. Additionally, D.M.S. consistently stated the gun discharged *after* he had re-inserted the magazine. Thus, there was evidence upon which it could be inferred that the magazine was actually in the gun when D.M.S. was playing with it, that he racked it and pulled the trigger at least once while holding the hammer, and that he ultimately pulled the trigger without holding the hammer while in close proximity to Channell.

**{¶ 32}** While we agree with law enforcement and the juvenile court that this incident was a tragic accident and that D.M.S. did not intend to kill his friend, based on this record, we are constrained to conclude there was sufficient evidence that the actions taken by D.M.S. while acting out a first-person video game created a substantial risk of harm to his friends and that he heedlessly disregarded that risk by pointing the gun at his friends. Thus, we conclude the juvenile court erred when it found the State had not established probable cause.

**{¶ 33}** Accordingly, the sole assignment of error is sustained.

### III. Conclusion

**{¶ 34}** The judgment of the juvenile court is reversed, and this matter is remanded for a hearing on amenability.

. . . . . . . . . . . . .

WELBAUM, J., concurs.

DONOVAN, J., dissents:

**{¶ 35}** The majority relies in part upon *Erby,* 2d Dist. Montgomery No. 27799, 2018-Ohio-3695, wherein the defendant admitted to the police that he knew the handgun was loaded and that he was waving it in the vicinity of the victim.   This is distinguishable from D.M.S's circumstance.   The trial court evaluated credibility herein and credited the testimony of D.M.S. that "he had removed the clip before playing with it and further did not believe there was a bullet in the chamber." Order, p. 6 (Mar. 27, 2020).   We should defer to those credibility determinations. *Dawson,* 1st Dist. Hamilton No. C-130765, 2015-Ohio-488, ¶ 9, citing *Washington*, 1st Dist. Hamilton No. C130213, 2014-Ohio-4178, ¶ 13.

**{¶ 36}** Furthermore, in my view, the trial court carefully evaluated the evidence and concluded an essential element of reckless homicide was lacking. Given the trial court's factual findings, I would not disturb the trial judge's conclusion on sufficiency for probable cause purposes. The trial judge's judgment recognized that there was a lack of evidence of recognition of a known risk and perverse disregard thereof.   I would affirm.

Copies sent to:

Mathias H. Heck, Jr.
Heather N. Ketter
Jon Paul Rion
Catherine H. Breault
Hon. Anthony Capizzi