[Cite as *In re J.G.*, 2025-Ohio-676.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

IN RE: J.G.

:
:
:   C.A. No. 30242
:
:   Trial Court Case Nos. A-2024-000500-
:   01,02,03,04,05,06,07,08,09,0A,10,11
:
:   (Appeal from Common Pleas Court-
:   Juvenile Division)
:

. . . . . . . . . . .

O P I N I O N

Rendered on February 28, 2025

. . . . . . . . . . .

MICHAEL P. ALLEN, Attorney for Appellant

JACOB S. SEIDL, Attorney for Appellee

. . . . . . . . . . . .

TUCKER, J.

{¶ 1} The State of Ohio appeals from the juvenile court's final order overruling its motion to transfer the above-captioned case to the general division of the common pleas court.

{¶ 2} Following a hearing, the juvenile court found no probable cause to believe that 15-year-old J.G. was responsible for any of the charged offenses, which would be felonies if committed by an adult. The State challenges the juvenile court's probable-cause determination. The State contends it demonstrated probable cause to find J.G. responsible as an accomplice in the commission of felony murder and several other offenses.

{¶ 3} We conclude that the State established probable cause to believe J.G. aided and abetted in the commission of felony murder, aggravated robbery, felonious assault, attempted grand theft of a motor vehicle, and possession of criminal tools. The juvenile court's judgment will be reversed as to those offenses, and the case will be remanded for an amenability hearing. The State makes no argument, however, regarding probable cause to believe J.G. was responsible for evidence tampering. As a result, we will not disturb the juvenile court's finding of no probable cause as to that offense.

## I. Background

{¶ 4} The State filed a delinquency complaint and later an amended complaint against J.G. in juvenile court, charging him with multiple acts that would constitute felonies if committed by an adult. The offenses included four counts of murder, two counts of aggravated robbery, two counts of felonious assault, evidence tampering, attempted grand theft of a motor vehicle, and possession of criminal tools. The complaint also contained eight firearm specifications.

{¶ 5} The State filed a motion and later an amended motion asking the juvenile court to relinquish jurisdiction and to transfer the case to the common pleas court's

general division. The juvenile court held a hearing to determine whether there was probable cause to believe J.G. had committed the charged offenses. Witnesses included three police officers, two detectives, and one of the alleged victims.

{¶ 6} At the hearing, the State presented evidence of J.G.'s involvement in two incidents that occurred on January 21, 2024. The first involved an attempt to break into a 2015 Hyundai Sonata in the Kettering Health parking garage on Grand Avenue. The State played a nine-minute security video that showed J.G. and two companions – D.F., a juvenile, and Jeff Lewis, a 20-year-old – approaching the car around 5:00 p.m. The video depicted D.F. trying to open the driver's side door with what appeared to be a screwdriver while J.G. and Lewis appeared to act as lookouts. At one point, J.G. joined D.F. at the driver's side door. They failed to gain entry, however, and eventually walked away. During his post-arrest interview at the police department, J.G. stated that they had been attempting to take items from the Hyundai.

{¶ 7} The second incident occurred later the same day. Around 7:00 p.m., Nathanial Eads pulled his Chevy Impala into a Dollar General parking lot on Salem Avenue. J.G., D.F., and Lewis were standing outside the store. They informed Eads that it was closed and that they were waiting for a ride. Eads did not know J.G. or his companions but offered them a ride. The trio accepted the offer. J.G. sat in the front passenger's seat, D.F. sat behind Eads, and Lewis sat in the back beside D.F. After stopping at a drive-through convenience store, Eads proceeded to the intersection of Kammer Avenue and Woodward Avenue in Dayton. As he approached a stop sign, Eads recognized the sound of a handgun being cocked and felt a gun barrel against his head.

{¶ 8} According to Eads, D.F. ordered him to put the car in park and to remove the keys from the ignition. Eads responded by raising his hands in the air and refusing to move. Eads testified that he told J.G. to put the car in park. During his police interview, J.G. recalled Eads telling him to put the car in park and D.F. telling him to remove the keys. In any event, J.G. placed the car in park and took the keys from the ignition. Eads recalled J.G. dangling the keys and saying, "I like this car." During his post-arrest interview, J.G. admitted saying "this is a nice car" and "this is us." When a detective inquired about the meaning of "this is us," J.G. explained that it meant he and his companions were going to take the car.

{¶ 9} At D.F.'s direction, Eads stepped out of the vehicle after J.G. took the keys. Eads testified that D.F. then took his wallet and phone and threw them on the ground. Eads recalled J.G. rummaging through the passenger's side of his car as if looking for "stuff to take." Eads stated that J.G. then approached the driver's side and announced that the car was going to be his. During his interview, J.G. told a detective that Eads had requested the car keys back so he could leave, but J.G. refused to return them.

{¶ 10} At one point, Eads informed D.F. that he had a small bag of marijuana under the driver's seat. D.F. then sat in the driver's seat with both feet outside of the car and reached under the seat. As D.F. did so, his handgun fell on the floorboard. Eads quickly grabbed the gun and pointed it at D.F. Eads testified that he fired one shot when D.F. lunged at him. The shot struck D.F. in the chest, killing him. Upon hearing the shot, J.G. and Lewis fled on foot. J.G. ran across the yard of a nearby house and dropped the car keys. Law enforcement officers who responded to the scene found screwdrivers in D.F.'s

pocket.

{¶ 11} An investigation led police to identify J.G. and Lewis as associates of D.F. Investigators discovered an Instagram account belonging to J.G. that included information about the shooting. The account included a video that had been posted on January 22, 2024. It showed D.F. and J.G. walking down a street earlier on the day of the shooting. The video depicted D.F. brandishing a handgun. It was unclear, however, whether J.G. saw the handgun at that time. During his police interview, J.G. denied knowing that D.F. was armed before D.F. held the handgun to Eads' head. At the time of the probable-cause hearing, investigators had not located Lewis, and no charges had been filed against him.

{¶ 12} Based on the evidence presented, the juvenile court found no probable cause to believe that J.G. had committed any of the offenses charged. It reasoned:

This Court has carefully and fully considered the evidence presented, as well as the arguments of the parties, and is unable to find that the State sufficiently proved that J.G. either actively participated in the charged offenses or possessed the same intent as the principal actor in the charged offenses. The State failed to demonstrate that J.G. actively attempted to break into the Hyundai Sonata at Kettering Health. The State failed to demonstrate that J.G. knew that D.F. had a gun or that J.G. knew that D.F. was planning to use said gun to attempt to rob Nathaniel Eads. The State failed to prove that J.G. purposefully disposed of the keys to Eads's Impala. While the events of January 21, 2024 were undeniably devastating and heartbreaking, the Court cannot find that a person who did

not actively participate in or encourage unlawful conduct acted with the requisite intent necessary for a finding of complicity.

Having carefully considered the evidence and testimony presented, the Court finds that the State failed to sufficiently prove that probable cause exists to find that [J.G.] is responsible for the commission of the eleven charged offenses, including the firearm specification on charges 1-8, as alleged in the Amended Complaint.

August 13, 2024 Interim and Final Order at p. 8.

{¶ 13} The State appealed from the trial court's probable-cause ruling, advancing one assignment of error.

## II. Analysis

{¶ 14} The State's sole assignment of error is as follows:

**The trial court erred when it found probable cause did not exist.**

{¶ 15} The State contends it established probable cause to believe that J.G. committed the charged offenses. Regarding the aggravated robbery and related felony-murder charges stemming from D.F.'s death, the State claims its evidence established J.G.'s complicity in the aggravated robbery that led to the death. At a minimum, the State argues that J.G. participated in the robbery by taking the car keys and announcing that the car was going to be his. For purposes of aggravated robbery and murder, the State contends it was immaterial whether J.G. purposely disposed of the car keys while fleeing or whether he knew that D.F. was armed. Regardless, the State claims it established probable cause to believe J.G. did know D.F. had the weapon. Finally, regarding the attempted grand theft of the Hyundai in the parking garage, the State contends it

established probable cause to believe J.G. assisted D.F. by serving as a lookout or by helping him try to break into the car.

{¶ 16} In response, J.G. asserts that the State's case relied on speculation and assumptions rather than evidence of his knowledge of or participation in the alleged offenses. J.G. also contends he acted out of duress and fear of D.F. rather than with criminal intent. J.G. stresses his youth, noting that he was only 15 years old, whereas D.F. was 17 years old, and Lewis was 20 years old. According to J.G., the State established only his presence and passive compliance with D.F.'s orders. He reasons that his act of briefly holding Eads' car keys at D.F.'s direction demonstrated neither voluntary participation nor criminal intent. J.G. also insists that he did not know D.F. possessed a firearm until it was pulled on Eads. Finally, regarding the parking-garage incident, J.G. argues that he simply wandered around before eventually standing beside D.F., who alone was trying to break into the car.

{¶ 17} Given J.G.'s age, the nature of the alleged offenses, and J.G.'s non-existent criminal history, the State's amended motion to transfer his case requested a discretionary bindover. In such a case, a juvenile court must hold a hearing to determine the existence of probable cause to believe the child committed the acts alleged. *In re D.M.S.*, 2021-Ohio-1214, ¶ 17 (2d. Dist.). If probable cause exists, a juvenile court then must order a full investigation, including a mental examination of the child, before holding an amenability hearing to determine whether jurisdiction should be transferred to adult court. *Id.* Here the juvenile court did not order an investigation or hold an amenability hearing because it found probable cause lacking.

{¶ 18} A juvenile court's probable-cause hearing is a preliminary, non-adjudicatory proceeding. *Id.* at ¶ 19. The State's evidence must do more than create mere suspicion of guilt but need not prove guilt beyond a reasonable doubt. *Id.* The State's evidence is not required to be "unassailable" to be found credible. *Id.* The State also is not required to disprove alternative theories of the case or to marshal all available evidence at a probable-cause hearing. *In re E.S.*, 2023-Ohio-4273, ¶ 24.

{¶ 19} When determining probable cause, a juvenile court " 'must evaluate the quality' " of the State's evidence as well as any countervailing evidence challenging probable cause. *In re D.M.S.* at ¶ 20, quoting *In re A.J.S.*, 2008-Ohio-5307, ¶ 43. " '[W]hile the juvenile court has a duty to assess the credibility of the evidence and to determine whether the state has presented credible evidence going to each element of the charged offense, it is not permitted to exceed the limited scope of the bindover hearing or to assume the role of the ultimate fact-finder.' " *Id.*, quoting *In re A.J.S.* at ¶ 44.

{¶ 20} A juvenile court's sole task is to determine whether the State presented sufficient credible evidence of probable cause, i.e., reasonable grounds to believe that the child committed the offenses charged. *In re E.S.* at ¶ 22-24. A juvenile court's credibility determinations are entitled to deference, but we review de novo whether the State established probable cause. *In re D.M.S.* at ¶ 21.

{¶ 21} Here the State's amended complaint charged J.G. with four counts of felony murder due to D.F.'s death. Counts one and three alleged murder as a proximate result of aggravated robbery (deadly weapon and serious physical harm). Counts five and seven alleged murder as a proximate result of felonious assault (deadly weapon and serious

physical harm). Counts two and four alleged aggravated robbery (deadly weapon and serious physical harm). Counts six and eight alleged felonious assault (deadly weapon and serious physical harm).

{¶ 22} On appeal, the State argues that it established probable cause to believe J.G. was complicit in the aggravated robbery of Eads and the murder of D.F. Complicity by aiding and abetting requires evidence " 'that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal.' " *State v. McFarland*, 2020-Ohio-3343, ¶ 29, quoting *State v. Johnson*, 93 Ohio St.3d 240 (2001), syllabus. Shared criminal intent " 'may be inferred from presence, companionship and conduct before and after the offense is committed.' " *Johnson* at 245, quoting *State v. Pruett*, 28 Ohio App.2d 29, 34 (4th Dist. 1971).

{¶ 23} Contrary to J.G.'s argument, the State insists that he voluntarily and actively participated in the events leading to D.F.'s death. Based on our review of the evidence, we agree. Even if we accept that J.G. removed Eads' car keys from the ignition at the direction of D.F., the record reveals that J.G. did much more. Eads testified that J.G. dangled the keys and said, "I like this car." J.G. himself admitted also saying "this is us," meaning that he and his companions were going to take the car. Eads similarly recalled J.G. announcing that the car was going to be his. According to Eads, J.G. also riffled through the passenger's side of the car as if looking for items to take. Finally, J.G. admitted to a detective that he refused Eads' request for the keys to be returned so Eads could leave. The foregoing evidence established probable cause to believe that J.G.

actively supported and assisted in the aggravated robbery with shared criminal intent.

{¶ 24} In holding otherwise, the juvenile court found a lack of evidence that J.G. knew D.F. had a gun or was planning to use a gun to rob Eads. The juvenile court also cited a lack of evidence that J.G. purposely dropped the car keys while fleeing the scene. Whether J.G. initially knew about D.F.'s possession of a firearm or intent to use the weapon, however, was immaterial. The State need not prove an accomplice's knowledge that the principal offender even possessed a firearm to convict the accomplice of aggravated robbery. *State v. Letts*, 2001 WL 699537, *3 (2d Dist. June 22, 2001); *see also State v. Kimble*, 2008-Ohio-1539, ¶ 33 (7th Dist.). In any event, J.G. unquestionably became aware of a weapon and D.F.'s intended use of it when D.F. pointed a handgun at Eads' head. After these actions by D.F., J.G. made statements about taking the car, rummaged through the car looking for items to steal, and denied Eads' request for the keys to be returned, thereby actively participating in the aggravated robbery. Finally, the trial court's finding about a lack of evidence that J.G. purposefully dropped the keys was perhaps relevant to evidence tampering, but it did not undermine the existence of probable cause regarding aggravated robbery and the related felony-murder charges. When J.G. dropped the keys while fleeing, the aggravated robbery already had been accomplished.

{¶ 25} For the reasons set forth above, the juvenile court erred in finding no probable cause to believe that J.G. was complicit in the two counts of aggravated robbery (counts two and four), the two related felony-murder charges (counts one and three), and the accompanying firearm specifications.

{¶ 26} The State also challenges the juvenile court's finding of no probable cause to believe J.G. was complicit in the attempted grand theft of a motor vehicle (count ten). That charge related to the Hyundai Sonata in the Kettering Health parking garage. The juvenile court found no probable cause that J.G. actively attempted to break into the car. We disagree. A security video recorded J.G. standing beside D.F., who was trying to open the car door. Although J.G.'s back was to the camera, a factfinder reasonably could infer from the video that he was assisting D.F. The video also showed J.G. standing beside the car and looking around while D.F. attempted to open the door. A trier of fact reasonably could infer from the video that J.G. was acting as a lookout for D.F. Serving as a lookout is sufficient to support a conviction as an accomplice. *State v. Hand*, 2006-Ohio-18, ¶ 176; *State v. Butler*, 2011-Ohio-1233, ¶ 15 (8th Dist.).

{¶ 27} A potential issue remains, however, as to whether evidence of attempting to break into a car establishes probable cause to believe the perpetrators were attempting to steal the car. Although neither party addresses this issue, our de novo review of probable cause persuades us that the State did establish probable cause of attempted grand theft of a motor vehicle. Notably, the only vehicle that D.F. tried to enter in the parking garage was a 2015 Hyundai Sonata. During the probable-cause hearing, a detective testified that Kias and Hyundais were notoriously easy to steal by peeling the steering column with a screwdriver. On the security video, D.F. used a screwdriver to attempt to enter the car. Police also found multiple screwdrivers in his possession after he was shot. The same detective testified that Kias and Hyundais were the most frequently stolen automobiles. The detective testified about his knowledge of D.F.'s

history of car thefts. A second detective confirmed that screwdrivers frequently were used by car thieves to open a door lock, strip the steering column, and start the vehicle.

{¶ 28} We note too that J.G. and his companions were looking for transportation on the day in question. The record contains a cell-phone video of the trio walking down the street earlier in the day. Thereafter, following the parking-garage incident, Eads encountered them outside the Dollar General in need of a ride. When D.F. subsequently robbed Eads at gunpoint, J.G. refused to return the car keys to Eads, stating that he and his companions were going to keep the car. In its closing argument, the State's theory of the case was that the J.G., D.F., and Lewis needed transportation and were looking for a car to steal that day. After unsuccessfully attempting to steal the Hyundai, they took Eads' vehicle at gunpoint. Although J.G.'s theory of the case may be different, a juvenile court may not determine the merits of competing, credible defense and prosecution theories when assessing probable cause. *In re D.M.S.*, 2021-Ohio-1214, at ¶ 20 (2d Dist.), quoting *In re A.J.S.*, 2008-Ohio-5307, at ¶ 43. That task is reserved for the factfinder at trial. *Id.* Based on the evidence set forth above, the juvenile court erred in finding no probable cause to believe J.G. was complicit in attempted grand theft of a motor vehicle (count ten).

{¶ 29} As for the remaining counts of the amended complaint, the State's appellate brief contains no specific argument. Throughout its brief, the State asserts that probable cause existed to support the aggravated robbery and related felony-murder charges. The State also addresses attempted grand theft of a motor vehicle.

{¶ 30} At the beginning and end of its argument, the State broadly asserts that

probable cause existed to find J.G. responsible for the "charged offenses." Nowhere in its argument, however, does the State specifically address the two counts of felony murder predicated on felonious assault (counts five and seven). Nor does the State specifically address the two substantive counts of felonious assault (counts six and eight), the evidence-tampering charge (count nine), or possession of criminal tools (count eleven).

{¶ 31} This court typically will "decline to address issues that have not been raised." *State v. Bayman*, 2024-Ohio-5405, ¶ 33 (2d Dist.). Under App.R. 16(A)(7), an appellant's brief must contain "[a]n argument containing the contentions of the appellant with respect to each assignment of error[.]" Here, the State's brief contains no contentions regarding probable cause as it related to counts five through nine or count eleven of the amended complaint against J.G.

{¶ 32} Nevertheless, as a practical matter, we recognize that our probable-cause analysis above necessarily also demonstrated the existence of probable cause to believe J.G. acted as an accomplice in the two counts of felonious assault, the two corresponding felony-murder charges, and the charge for possession of criminal tools. Indeed, the same evidence that established probable cause to find J.G. responsible as an accomplice in the commission of aggravated robbery and felony murder predicated on aggravated robbery also established probable cause to believe he acted as an accomplice in the commission of felonious assault and felony murder predicated on felonious assault.

{¶ 33} If this were not so obviously true, we would find that the State waived any argument regarding probable cause as to counts five through eight. We presume the State did not specifically address those counts, however, because the evidence and its

argument regarding felony murder predicated on aggravated robbery applied equally to them. The better practice would have been for the State briefly to address probable cause as to counts five through eight. Nevertheless, under the circumstances before us, the State adequately raised the issue by referencing "the charged offenses" while focusing on factual events surrounding the aggravated robbery and the shooting. As a result, based on the reasoning set forth above, we conclude that the trial court erred in finding no probable cause to believe J.G. was complicit in two counts of felonious assault (counts six and eight), the two related felony-murder charges (counts five and seven), and the accompanying firearm specifications.

{¶ 34} We reach the same conclusion regarding the possession-of-criminal-tools charge. The tools at issue were the screwdrivers found in D.F.'s possession, at least one of which he used to attempt to break into the Hyundai Sonata. Given our finding of probable cause to believe J.G. was complicit in the attempted grand theft of a motor vehicle using screwdrivers, he also was complicit in the possession of those screwdrivers. This conclusion necessarily flows from our analysis of the attempted grand-theft charge. Once again, we presume this is why the State focused on the attempted theft while neglecting to address probable cause as it related to possession of criminal tools. Although the better practice would have been for the State briefly to address the criminal-tools charge, it adequately raised the issue by referencing "the charged offenses" while focusing on the attempted grand-theft charge involving the use of screwdrivers. As a result, the juvenile court erred in finding no probable cause to believe J.G. was complicit in the possession of criminal tools (count eleven).

{¶ 35} We reach a different conclusion, however, regarding evidence tampering (count nine). That charge involved J.G. dropping Eads' car keys as he fled the scene on foot. The juvenile court found a lack of evidence that J.G. "purposefully disposed of the keys." During his police interview, J.G. asserted that he dropped the keys when he fell while running. On appeal, the State does not address probable cause as it relates to evidence tampering. The State only mentions J.G. dropping the keys in the context of arguing that this act was irrelevant to the aggravated robbery. Without any argument from the State regarding probable cause to believe J.G. tampered with evidence, we decline to address that aspect of the juvenile court's ruling.

{¶ 36} Based on the reasoning set forth above, the State's assignment of error is sustained.

### III. Conclusion

{¶ 37} The judgment of the Montgomery County Common Pleas Court, Juvenile Division, is affirmed in part and reversed in part. The judgment is affirmed as to the juvenile court's unchallenged finding of no probable cause on count nine of the amended complaint against J.G. The judgment is reversed as to the juvenile court's finding of no probable cause on counts one through eight and counts ten and eleven, as well as the accompanying firearm specifications. The case is remanded for further proceedings, including an amenability hearing.

. . . . . . . . . . . . .

EPLEY, P.J. and HUFFMAN, J., concur.