[Cite as *In re E.S.*, 2021-Ohio-4606.]

## COURT OF APPEALS OF OHIO

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

IN RE E.S., Jr.

A Minor Child

:
:
:

No. 110378

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** December 30, 2021

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. DL-20-106024

***Appearances:***

Rachel A. Kopec, *for appellee.*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Eben O. McNair, Assistant Prosecuting
Attorney, *for appellant.*

MARY EILEEN KILBANE, J.:

{¶ 1} The state of Ohio appeals the juvenile court's denial of the state's motion to transfer jurisdiction of this case from the juvenile court to the general division of the Cuyahoga County Common Pleas Court. The state argues that the juvenile court erred in denying its motion to transfer the case because the state provided sufficient credible evidence to support a finding of probable cause that appellee, E.S. Jr. ("E.S."), whose date of birth is July 4, 2003, committed involuntary

manslaughter as alleged in the complaint. After a thorough review of the record and law, this court affirms the juvenile court's judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

{¶ 2} The instant matter arose from an incident that occurred in the early morning of June 9, 2020. E.S., who was 16 years old at the time, was with his best friend E.M., driving around in a vehicle that had been reported stolen on May 25, 2020. E.M. was driving, and E.S. was in the passenger seat. A mutual friend of theirs, M.W., had requested a ride from E.S. on social media from a hotel party in Independence, Ohio. E.S. agreed to pick M.W. up and give her a ride home. Shortly after picking M.W. up, a Cuyahoga Heights police car attempted to effectuate a traffic stop of the vehicle for speeding. E.M. did not pull over, and a chase ensued. The vehicle went back onto the highway and eventually went off road and crashed in a ravine approximately 200 yards east of 4600 Hiedtman Parkway. While E.S. and M.W. were able to flee the scene, E.M. was found unconscious in the grass near the crashed vehicle with a bullet wound. He was taken to the hospital where he later died.

{¶ 3} On July 15, 2020, an arrest warrant was issued for E.S. charging him with five counts: (1) involuntary manslaughter, (2) reckless homicide; (3) having weapons while under disability; (4) receiving stolen property; and (5) improperly handling firearms in a motor vehicle. Counts 1, 2, and 4 carried one-year firearm specifications, and Counts 1 and 2 also carried three-year firearm specifications. Counts 1, 2, 3, and 5 had forfeiture of weapon specifications.

{¶ 4} On July 23, 2020, the state filed a notice of mandatory bindover and a request for a probable cause hearing as well as a motion requesting the juvenile court to relinquish jurisdiction pursuant to R.C. 2152.10(B) and Juv.R. 30(A). The juvenile court held a probable cause hearing on January 8, 2021, which was continued to and concluded on January 28, 2021. The state called 13 witnesses. The defense did not call any witnesses. What follows is a summary of the relevant testimony.

{¶ 5} C.A., the mother of E.S., testified that E.S. had been previously adjudicated delinquent for a felonious assault that occurred on March 29, 2017. She testified that E.M. and E.S. had been friends since they were children. C.A. also testified repeatedly that both E.S. and M.W. had told her that after crashing into the ravine, all three of them, including E.M., got out of the vehicle and fled the scene. She maintained that E.S. told her the last time he saw E.M., he was alive, fleeing the scene after exiting the vehicle.

{¶ 6} M.W. took the stand and was the only witness the state put on who was in the vehicle before, during, and after the crash. She testified definitively that she never saw a firearm in either E.M.'s or E.S.'s possession and reiterated this was the same statement she gave to the detectives when interviewed shortly after the incident. She also testified that for the entire time she spent in the vehicle with E.S. and E.M., they were both visible to her and she never saw a firearm in the vehicle. She testified that she braced herself for the crash and afterward she heard a ringing. She testified that was the only noise she heard. M.W. testified that as soon as the

car stopped, all three individuals got out of the vehicle and fled the scene. Because she was sitting in the rear passenger seat, she exited the vehicle on the right and followed E.S., who exited the vehicle from the front passenger seat. She testified that she saw E.M. exit the vehicle from the driver's door and saw him flee in the opposite direction of her and E.S. M.W. testified that E.M. seemed okay when he got out of the car and did not appear injured or bleeding.

{¶ 7} First on the scene, Cuyahoga Heights police officer Kevin Stack ("Officer Stack") also testified at the probable cause hearing. He testified that on June 9, 2020, he and his partner Officer Kontura were patrolling in a Cuyahoga Heights police cruiser, when at around 5 a.m., he observed a silver Kia driving at a high rate of speed in a 35 m.p.h. zone. They began following the vehicle for several minutes until they witnessed the vehicle turn left at a red light. The vehicle stopped briefly at the next red light, where Office Stack was able to run the vehicle's license plate and discovered the vehicle was listed as stolen. When the vehicle ran the second red light, Officer Stack turned his lights and sirens on and attempted to conduct a traffic stop. When the vehicle failed to yield, the officers pursued the vehicle to a steep access road and then onto a field on the Steel Mills property. At that time, they were pursuing the vehicle slowly through the field because it was still dark out and the stolen vehicle was kicking up dirt, which made visibility poor. They were approximately 500 feet behind the stolen vehicle when Officer Stack saw the vehicle stop and tilt upwards when it crashed into the ravine. They stopped the cruiser, and Officer Stack saw two individuals, a male and a female, get out of the

vehicle and begin climbing up the embankment on the opposite side of the ravine where the stolen vehicle had crashed. Officer Stack testified that he approached the vehicle, whose engine was revving and smoking, to check and make sure nobody was left inside, while his partner, Officer Kontura, went on foot across the ditch towards the fleeing individuals. Officer Stack testified that as he carefully approached the vehicle, he noticed the front passenger and rear passenger doors were opened. He also noticed the vehicle was smoking and its engine was revving loudly.

{¶ 8} Officer Stack testified that he looked into the vehicle on the passenger side where the doors were open and did not see any individuals. He then went around and opened the driver side door, which was closed, and reached into the vehicle to turn the ignition off. He did not notice anything remarkable in the vehicle at that time. After clearing the vehicle, Officer Stack went back to his cruiser. He drove the cruiser along the ravine to find a place shallow enough to cross to assist his partner; however, unable to find a crossing, he returned to the stolen vehicle to follow his partner on foot.

{¶ 9} As he walked toward the ravine, Officer Stack noticed for the first time a young male, later identified as E.M., lying face down in the tall grass just outside the vehicle. Office Stack testified that visibility was low because of the pre-dawn lighting, but as far as he could tell there was no trail of blood or anything leading to E.M. As soon as he saw the young male, Officer Stack drew his firearm and began giving verbal commands to the person, who remained unresponsive. It was at this time, Cleveland police arrived on the scene. During cross-examination, counsel for

E.S. played video footage from the body camera of a responding Cleveland police officer, which showed Officer Stack with his firearm drawn standing near the body of E.M. Office Stack also stated that he did not notice any trail of any type leading up to E.M.'s body and that he just happened upon it.

{¶ 10} Cleveland police officer Pelsnik ("Officer Pelsnik") also testified at the probable cause hearing. He arrived on scene after getting a radio request for assistance from Cuyahoga Heights police. When he arrived, he noticed Officer Stack pointing his firearm approximately 10 feet away from a black male who was lying on the ground face down. The male, later identified as E.M., was unresponsive, and the officers were unsure of his status. Officer Pelsnik went over to E.M. and turned him over. At that time, he saw E.M.'s eyes and mouth were open with no signs of breathing. Officer Pelsnik checked for a pulse, which he did not feel, and he began CPR on the victim. E.M. never regained consciousness. Officer Pelsnik testified he lifted E.M.'s shirt and noticed two gunshot wounds, one on the upper chest and the other on the opposite side near the rear shoulder blade.[1]

{¶ 11} Jefffrey Oblock, a DNA analyst at the Cuyahoga County Regional Forensic Science Laboratory, also testified at the probable cause hearing. He testified regarding the DNA examination report that was created to document the various items found in the vehicle that were tested for DNA. He testified that he analyzed the grip and trigger areas of a black semi-automatic M&P Shield 9 mm

---

[1] The two wounds were from a single bullet with the chest wound later identified as an entrance wound and the rear shoulder blade wound as the exit wound.

firearm that was found underneath the front seat in the vehicle. The analysis revealed the firearm contained DNA from five unknown contributors. One contributor was a match for E.S. that was 51.8 quintillion times more probable than a coincidental match to an unrelated African American person. A match could not be made for E.M. or M.W. due to insufficient genetic material on the swabs. None of the other four possible genetic contributors were discovered.

{¶ 12} Dr. Elizabeth Mooney ("Dr. Mooney") testified at the hearing in her capacity as the medical examiner assigned to this case who performed the autopsy and prepared an autopsy report. After her examination, she concluded that the cause of death was a gunshot wound to the chest and the manner of death was a homicide. Dr. Mooney's examination revealed a gunshot wound to the upper right side of the chest, beneath the clavicle with an exit wound in the upper left side of the back close to the left armpit. She specified that the trajectory of the bullet was downward, front to back, passing through the first right rib and exiting just beneath the second left rib. She explained that it was ruled a homicide because the entrance wound did not have the typical markings that occur from a close-range self-inflicted gunshot. The wound indicated the firearm was discharged at least a foot away but likely not more than three feet. The bullet passed through two of the three largest arteries that would have caused heavy bleeding and unconsciousness within seconds.

{¶ 13} Detectives David Arkley and Matthew Cavanaugh from the City of Cleveland Division of Police, Crime Scene Unit, both testified regarding the

photographs they took at the scene. Detective Arkley photographed the two Cuyahoga Heights officers in various positions as they stood on the scene. He also took photographs of their firearms, their magazine cartridges, and the rounds that were in those magazines. Detective Arkley explained how he emptied the rounds out of the magazine cartridges for both officers' firearms and stood them up to photograph the number of rounds left in each magazine. Both officers had their full rounds of ammunitions. On cross-examination, Detective Arkley testified that he was specifically instructed to photograph the Cuyahoga Heights officers and that he did not photograph any other officers or firearms. Detective Cavanaugh testified briefly regarding the photographs he had taken, which depict the crime scene and were marked as state's exhibit Nos. 1-132.

{¶ 14} Detective Tommy Mason ("Detective Mason") from the City of Cleveland Division of Police, Crime Scene Unit, also testified at the probable cause hearing. Detective Mason was one of the detectives who processed and photographed the vehicle and items found within it once it was towed to Cleveland's Impound Lot Number 2. He testified that before processing a vehicle, he discusses the case with the other detectives to understand what they are looking for, the type of crime involved, circumstances of the crime, and how the vehicle was involved. During the processing, he inventoried 19 items discovered in the vehicle, which included a firearm, one fired bullet, one bullet fragment, tennis shoes, a hat, a purse, cell phones, and swabs of suspected DNA from the door handles, steering wheel, and firearm. Item number 10, the fired bullet, was recovered from the driver's side door.

Before photographing the bullet hole, he marked the door with tape to easily indicate the hole, which was above the door handle. There was no exit hole made, so Detective Mason testified that he removed the panel from the door and the fired bullet fell out. Item number 19 was the black semi-automatic M&P Shield 9 mm firearm, which contained one fired cartridge case and six live rounds. Detective Mason testified he found the firearm underneath the passenger front seat, and the state introduced multiple photographs showing the location and condition in which the firearm was discovered. He testified that at the time these photographs were taken, he and no other officer had touched the firearm, so the photographs accurately depict the condition and position of the firearm when he discovered it. The firearm was submitted for DNA testing.

{¶ 15} On cross-examination, Detective Mason testified that state's exhibit No. 404 listed all the items he submitted for DNA testing, which included two swabs of suspected DNA from the nipple of a juice bottle, swabs from two recovered cell phones, the interior windshield, two swabs of both the front and rear passenger interior door handles, as well as the front driver-side interior door handle, the steering wheel and gearshift knob. The recovered bullet was never tested for E.M.'s or anyone else's DNA.

{¶ 16} The court then questioned Detective Mason about whether he had discovered any gunshot residue in the vehicle given the circumstances of the alleged crime in this case:

THE COURT: Had you not learned that a passenger in that vehicle was purportedly shot?

THE WITNESS: I did not.

THE COURT: Did anyone communicate a theory to you as to how that occurred at that time?

THE WITNESS: No, ma'am.

The court expressed its confusion regarding this testimony in light of Detective Mason's prior testimony that he did talk to the detectives in the case to get an idea of what kind of processing the evidence required based on the type of crime that occurred. Detective Mason agreed with the court that even trace evidence of gunpowder residue would likely be found on DNA swabs taken from inside the vehicle, without even intentionally looking for it. And despite Detective Mason's prior experience with collecting trace evidence, no gunpowder residue testing was requested in this case. Following Detective Mason's testimony, the probable cause hearing was continued until January 28, 2021.

{¶ 17} At the continued hearing, the state called Kristin Koeth ("Koeth"), who testified regarding the ballistic report she authored in this case as a firearms examiner at the Cuyahoga County Regional Forensic Science Laboratory. She examined the firearm, the fired bullet, and the cartridges in this case, and she test-fired the weapon into a water tank to preserve the fired cartridges. Her examination revealed to her that item number 25, the fired bullet, came from item number 35, the black semi-automatic M&P Shield 9 mm firearm found under the front passenger seat. Koeth testified that while she could not determine from what

firearm the bullet fragment, item number 26, was discharged from, she could determine it was not discharged from item number 35, the 9 mm in the vehicle.

{¶ 18} Detective Raymond Diaz ("Detective Diaz"), from the City of Cleveland Division of Police, Homicide Unit, was the last witness the state called during the probable cause hearing. He testified that upon being paged about this incident, he went to the hospital to see E.M. before going to the crime scene. The hospital staff informed him that E.M. had died from a gunshot wound to his right upper chest, which had exited his left armpit at a downward angle. The wound to his chest had left a large amount of blood on E.M. When Detective Diaz arrived at the scene, he first spoke with Officers Stack and Kontura from Cuyahoga Heights. Detective Diaz then had another officer photograph Officers Stack and Kontura on the scene and inspected their firearms to make sure they had not fired any rounds. He found both officers' firearms to be fully loaded. He then took a statement from both officers.

{¶ 19} Detective Diaz then went to Impound Lot 2 and participated in photographing the vehicle and processing the items found within it. Detective Diaz testified that after finding the bullet defect in the front driver-side door and the fired bullet in the door panel, he believed E.M.'s injuries were consistent with being shot in the vehicle while sitting in the driver's seat. Despite this theory of the case, Detective Diaz did not have the vehicle swabbed for trace gunpowder residue.

{¶ 20} Detective Diaz also testified regarding his attempt to interview E.S. and his mother on June 11, 2020, at his mother's house. Detective Diaz requested

for E.S.'s mother to provide him with a DNA sample of E.S., but the request was refused and the interview was terminated. Detective Diaz testified that he witnessed E.S. walk to a garbage can at the back of the house where the interview occurred and throw away an iced tea he had been drinking. Once E.S. walked back into the house, as the police were exiting, they opened the garbage can, saw two iced tea cans, and confiscated both of them for a DNA sample.

{¶ 21} Finally, Diaz testified that he conducted an interview with E.S. on July 26, 2020, after E.S. had been arrested. The interview took place in the Homicide Unit, and E.S.'s mother was present. E.S. stated he was in the stolen vehicle but that at no time did he ever discharge a firearm. He reiterated he never discharged the firearm inside the car and then he ended the interview.

{¶ 22} During cross-examination, Detective Diaz stated that he never tested the Cuyahoga Heights officers' hands for gunshot residue and that his conclusion that they never used their firearms was based solely on their statements and the fact that their firearms were fully loaded at that time. He testified that he was unsure when and who exactly found the firearm in the vehicle, but that it was definitively located under the front passenger seat. Detective Diaz also admitted that he never requested the bullet he believed killed E.M. to be swabbed for E.M.'s DNA. Detective Diaz stated, despite his theory of the case involving E.M. being shot in the vehicle, there was no blood or blood splatter found in the car:

> DEFENSE COUNSEL: Is it fair to say that if your theory of the case is an individual was shot in this car, there may be some blood in the car?

THE WITNESS: Yes.

DEFENSE COUNSEL: Okay. But again, you did not find any blood?

THE WITNESS: A. Not to my recollection, no.

{¶ 23} During closing arguments, counsel for E.S. emphasized that the only eyewitness, M.W., did not see or hear a gunshot and, in fact, saw the victim leave the vehicle unharmed. Counsel also emphasized inconsistencies in the state's evidence such as not checking for gunpower residue, not testing the fired bullet for E.M.'s DNA, and the lack of any blood evidence in the vehicle despite E.M. only wearing a t-shirt. The state emphasized that with the evidence of a fired bullet in the door, a discharged firearm with E.S.'s DNA, a right to left bullet trajectory through the victim, and a deceased male with a bullet wound, the only explanation is that E.S. was in possession of the firearm when it discharged and killed E.M.

{¶ 24} During the state's closing argument, the juvenile court expressed serious doubt as to exactly how and when E.S. was shot, stating that "there's just a lot of things that it just doesn't add up for me." The juvenile court found on the record that its doubt was related to the evidence or lack thereof for Counts 1 and 2. The state rested, and the probable cause hearing concluded with the state moving, and the court admitting, hundreds of photographs, video, medical examiner autopsy and ballistic reports, crime scene log, DNA report, and the firearm in question into evidence. Defense counsel stated she was unable to download the body camera video footage but was not moving it into evidence.

{¶ 25} The juvenile court issued a journal entry on February 19, 2021, denying the state's motion to transfer, stating that

[u]pon the conclusion of all evidence presented relating to the matter herein and the arguments of counsel, the court finds that the child was 16 years of age at the time of the conduct charged.

The Court finds that as to counts 1 and 2, there is *not* sufficient evidence to support the findings and theory of the acts alleged to find probable cause to believe that the child committed the acts.

However, the Court further finds that there is probable cause to believe that the child committed an act that would be the crime of count 3, Having Weapons Under Disability, in violation of Section 2923.13(A)(2) of the Revised Code and classified as a felony of the third degree if committed by an adult; count 4, of Receiving Stolen Property, in violation of Section 2913.51(A) of the Revised Code and classified as a felony of the fourth degree if committed by an adult, with one year firearm specification; and count 5, Improperly Handling of Firearms in a Motor Vehicle, in violation of Section 2923.16(B)) of the Revised Code and classified as a felony of the fourth degree if committed by an adult.

{¶ 26} On March 17, 2021 the state filed its notice of appeal, assigning one error for review:

I. The juvenile court erred by finding there was no probable cause that E.S. committed Involuntary Manslaughter.

**Law and Analysis**

{¶ 27} R.C. 2152.12(A) governs the mandatory transfers of juvenile cases to the general division of the common pleas court. It states in pertinent part:

After a complaint has been filed alleging that a child is a delinquent child by reason of committing a category two offense, the juvenile court at a hearing shall transfer the case if the child was sixteen or seventeen years of age at the time of the act charged and * * *[.]

(ii) Division (A)(2)(b) of section 2152.10 of the Revised Code requires the mandatory transfer of the case, and there is probable cause to believe that the child committed the act charged.

R.C. 2152.12(A)(1)(b)(ii). Involuntary Manslaughter, in violation of R.C. 2903.04, constitutes a "category two offense" pursuant to R.C. 2152.12(BB). Next, to determine if the case is a mandatory bindover, R.C. 2152.10(A)(2)(b) requires "[t]he child is alleged to have had a firearm on or about the child's person or under the child's control while committing the act charged and to have displayed the firearm, brandished the firearm, indicated possession of the firearm, or used the firearm to facilitate the commission of the act charged.

{¶ 28} The court properly found E.S. was 16 years old at the time of the offense. Furthermore, the acts charged in Count 2 constitute the offense of involuntary manslaughter, if committed by an adult. Last, the acts charged alleged E.S. had a firearm on or about his person and/or used the firearm to facilitate the commission of the involuntary manslaughter. Therefore, the case properly qualifies as a mandatory bindover pursuant to R.C. 2152.10(A)(2)(b) and 2152.12(A)(1). *See In re C.G.*, 8th Dist. Cuyahoga No. 97950, 2012-Ohio-5286, ¶ 30; Juv.R. 30.

{¶ 29} Pursuant to Juv.R. 30(A), "[i]n any proceeding where the court considers the transfer of a case for criminal prosecution, the court shall hold a preliminary hearing to determine if there is probable cause to believe that the child committed the act alleged * * *." The state argues on appeal that the juvenile court erred in not transferring the case because the state provided sufficient credible evidence of every element of involuntary manslaughter to support a finding that E.S. committed the offense.

{¶ 30} The state's burden of proof in these matters has been stated previously by this court in *State v. Hughley*, 8th Dist. Cuyahoga No. 108518, 2020-Ohio- 1277, ¶ 35:

> The Ohio Supreme Court has instructed that "the state must present credible evidence of every element of an offense to support a finding of probable cause, but that evidence does not have to be unassailable." *In re A.J.S.*, 120 Ohio St.3d 185, 2008-Ohio-5307, 897 N.E.2d 629, ¶ 46, citing *State v. Iacona*, 93 Ohio St.3d 83, 752 N.E.2d 937 (2001). The Supreme Court further explained, the juvenile court's role in bindover proceeding is that of a "gatekeeper" because it is "charged with evaluating whether sufficient credible evidence exists" to warrant transfer to adult court. *Id.*, citing *In re A.J.S.*, 173 Ohio App.3d 171, 2007-Ohio-3216, 877 N.E.2d 997 (10th Dist.).

{¶ 31} A juvenile court's probable cause determination in a bindover proceeding involves questions of both fact and law. *Hughley* at ¶ 36, citing *A.J.S.*, 120 Ohio St.3d 185, 2008-Ohio-5307, 897 N.E.2d 629, at ¶ 51. This court defers to the juvenile "court's credibility determinations by reviewing for an abuse of discretion, but we conduct a de novo review of the legal conclusion whether there was probable cause to believe that the juvenile committed the charged act." *In re C.G.,* 8th Dist. Cuyahoga No. 97950, 2012-Ohio-5286, at ¶ 31. *See also State v. Martin,* 8th Dist. Cuyahoga No. 108996, 2021-Ohio-1096, ¶ 15 (a witness's testimony and credibility are "best assessed by the trial court.") "The trier of fact is in the best position to make credibility determinations because it is able to view the demeanor of a witness while he or she is testifying; this court cannot. The trier of fact is therefore in the best position to determine if the proffered testimony is credible." *Khatib v. Peters*, 2017-Ohio-95, 77 N.E.3d 461, ¶ 28 (8th Dist.). "The

'probable' component of the probable cause determination means that the state must produce evidence that 'raises more than a mere suspicion of guilt, but need not provide evidence proving guilt beyond a reasonable doubt.'" *State v. Taylor*, 8th Dist. Cuyahoga No. 106502, 2018-Ohio-3998, ¶ 4, quoting *A.J.S.* at ¶ 42.

{¶ 32} After a thorough review of the record in this case, including the evidence presented at the probable cause hearing, and in light of the deferential standard of review we must apply to the juvenile court's credibility determinations, we conclude that the juvenile court did not err or abuse its discretion in finding that the state failed to present sufficient credible evidence to establish probable cause that E.S. committed involuntary manslaughter.

{¶ 33} To establish probable cause for involuntary manslaughter, the state needed to provide the juvenile court with sufficient credible evidence demonstrating that E.S. caused the death of another as a proximate result of committing a felony. R.C. 2903.04. The juvenile court did find there was probable cause that E.S. committed the crimes of having weapons while under disability, a violation of R.C. 2923.13(A)(2); receiving stolen property, a violation of R.C. 2918.41(A); and improperly handling a firearm in a motor vehicle, a violation of R.C. 2923.16(B) and, because E.S. had been previously adjudicated a delinquent, since all three offenses are felonies. Therefore, the state was only required to provide sufficient credible evidence that E.S. caused the death of E.M. as a proximate result of committing any of those offenses.

{¶ 34} Under a "proximate cause theory" this court has held

"[a] Defendant can be held criminally responsible for the killing regardless of the identity of the person killed or the identity of the person whose act directly caused the death, so long as the death is the proximate result of Defendant's conduct in committing the underlying felony offense; that is, a direct, natural, reasonably foreseeable consequence, as opposed to an extraordinary or surprising consequence, when viewed in the light of ordinary experience."

*State v. Ervin*, 8th Dist. Cuyahoga No. 87333, 2006-Ohio-4498, ¶ 25, quoting *State v. Dixson*, 2d Dist. Montgomery No. 18582, 2002 Ohio App. LEXIS 472 (Feb. 8, 2002). Therefore, legal analysis to assess proximate cause in this case must be tailored to whether there was sufficient credible evidence to establish that E.M.'s death was a direct, natural, and reasonably foreseeable consequence of E.S. commission of either felony. More simply put, was there sufficient evidence that E.M.'s death was a direct, natural, and reasonably foreseeable consequence of E.S.'s possession of a firearm?

{¶ 35} The record reflects the juvenile court very carefully considered the facts and circumstances of the June 9, 2020 incident upon which E.S. was charged. During the two-day probable cause hearing, the court heard 13 witnesses that included the only eyewitness M.W., one of the two Cuyahoga Heights officers who first arrived on scene, five Cleveland police detectives, ballistics expert, a DNA analyst, and a forensic pathologist. Throughout the hearing, the juvenile court was actively engaging with every witness by asking questions and taking notes. The juvenile court also reviewed and admitted into evidence hundreds of photographs, video footage, a medical examiners report, ballistic report, autopsy report, crime scene log, DNA report, and even the firearm found in the vehicle. Furthermore, the

juvenile court did not issue its ruling from the bench, but rather considered the matter for three weeks before issuing its judgment denying the state's motion.

{¶ 36} It is clear throughout the hearing that the court was actively engaged with the state's witnesses during their testimonies. For example, the court engaged with Detective Diaz regarding his "theory of the case" to try and understand how the firearm in the vehicle could have injured E.M. The juvenile court found it very difficult to conceive how a firearm in the hand of a juvenile in the passenger seat could be discharged at a downward angle through the right chest and out the left back armpit of the driver and pierce the front driver-side door above the door handle. The court also inquired of several witnesses how such a wound could have occurred without leaving any blood in the car.

{¶ 37} Though the trial court is given deference regarding witness credibility, this court still reviews de novo the legal conclusion of whether the evidence presented was sufficient for the state to meet its burden of establishing probable cause. *In re C.G.*, 8th Dist. Cuyahoga No. 97950, 2012-Ohio-5286, at ¶ 31. The state's main piece of evidence to support E.S.'s possession of the firearm is the DNA evidence from the swabs of the firearm's trigger and handle. While it is credible evidence that E.S.'s DNA was on that firearm, the evidence also shows there were four other individuals' DNA present there as well. And while the state made sure to test to see if E.M.'s and or M.W.'s DNA was a match, they did not attempt to match anyone else's DNA.

{¶ 38} Even more strikingly, as the court points out, despite the DNA analysis of the firearm, the state put forth no credible evidence that the fired bullet from the firearm, which was discharged into the front driver-side door, was the bullet that pierced E.M.'s body and caused his death. The fired bullet found in the driver's side door was never swabbed for E.M.'s DNA and neither was the bullet defect in said door. Presumably, at least one, if not both, of the items should have had E.M.'s DNA if the bullet pierced him in the vehicle. Similarly, the state failed to swab the vehicle for gunpowder residue to at least firmly establish the firearm was discharged in the vehicle. Furthermore, the only eyewitness, M.W., testified that she never saw a firearm in the vehicle nor did she ever hear one discharge in the vehicle. She also stated definitively that she witnessed E.M. get out of the vehicle and flee in the opposite direction, never mentioning he was hurt or bleeding.

{¶ 39} Our review of the record shows the state presented evidence that a firearm with E.S.'s DNA on it (as well as four others) at some point discharged a bullet into the front driver-side door, but failed to provide sufficient credible evidence that it was this bullet that caused the death of E.M. Without sufficient credible evidence to establish that E.M.'s death was proximately caused by the firearm found in the vehicle with E.S.'s DNA on it, the state failed to meet its burden to establish probable cause that E.S. committed involuntary manslaughter as a matter of law. *Hughley*, 8th Dist. Cuyahoga No. 108518, 2020-Ohio-1277, at ¶ 35.

{¶ 40} This case is similar to this court's recent decision in *In re D.R.*, 8th Dist. Cuyahoga No. 110212, 2021-Ohio-3350. There, this court similarly held that

the juvenile court did not err or abuse its discretion by denying the state's motion for mandatory bindover because the state failed to present sufficient credible evidence to establish probable cause that the juvenile committed aggravated robbery. *Id.* at ¶ 37. The state put forth testimonial evidence from both the detective involved and the alleged victim, as well as several exhibits. *Id.* at ¶ 39-50. Even though the juvenile court in that case also stated summarily in its entry there was no probable cause, "it [was] apparent that during the probable cause hearing, the juvenile court questioned the credibility of both [the victim's] eyewitness testimony and [the detective's] testimony connecting D.R. to the vehicle in question." *Id.* at ¶ 51. It was "evident that the juvenile court ultimately concluded that the evidence presented by the state was not credible." This court therefore deferred to the juvenile court's credibility determination and affirmed its decision to deny the motion to transfer for insufficient credible evidence to establish probable cause. *Id.*

{¶ 41} Like the court in *In re D.R.*, we find the state failed to present sufficient credible evidence that E.M.'s death was proximately caused by E.S.'s commission of felonious charges in Counts 3, 4, and 5 of the arrest warrant. We therefore hold the juvenile court did not err in finding the state did not present sufficient credible evidence to support a finding of probable cause for involuntary manslaughter.

{¶ 42} Therefore, the state's sole assignment of error is overruled.

{¶ 43} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY EILEEN KILBANE, JUDGE

ANITA LASTER MAYS, J., CONCURS;
SEAN C. GALLAGHER, P.J., DISSENTS WITH A SEPARATE OPINION

SEAN C. GALLAGHER, P.J., DISSENTING:

**{¶ 44}** I respectfully dissent and would reverse the decision of the juvenile court. Upon the record presented, I find the state presented not only sufficient but overwhelming evidence to show probable cause that E.S. committed the offenses of involuntary manslaughter and reckless homicide.

**{¶ 45}** The trial court's ruling and the majority's affirmance sets a dangerous precedent. Despite the testimony of 11 witnesses and numerous exhibits in a hearing memorialized by a more than 300-page transcript, the trial court, with no analysis, summarily ruled that there was no probable cause for the offenses of involuntary manslaughter and reckless homicide. "The Court finds that as to counts 1 and 2, there is not sufficient evidence to support the findings and theory of the acts alleged to find probable cause to believe that the child committed the acts."

{¶ 46} This ruling was not only problematic by its disconnect from the facts presented but it is inconsistent with the trial court's further determination in finding probable cause existed for the other offenses of having weapons while under disability, receiving stolen property, and improperly handling of firearms in a motor vehicle. Each of those were predicate offenses for the involuntary manslaughter charge. To find that there was probable cause for the predicate offenses but not for involuntary manslaughter is inherently inconsistent.

{¶ 47} While the Supreme Court of Ohio should not have to engage in error correction, in this instance, it is necessary to preserve the longstanding precedent involving probable cause determinations on juvenile bindovers. To not take and address this issue will result in the Supreme Court's own precedent being undermined. *In re A.J.S.*, 120 Ohio St.3d 185, 2008-Ohio-5307, 897 N.E.2d 629. For the reasons outlined below, I call on the Supreme Court of Ohio to review this case and reverse the outcome.

{¶ 48} Although we defer to the trial court's determinations regarding witness credibility, we review de novo the legal conclusion of whether the state presented sufficient evidence to demonstrate probable cause to believe that the juvenile committed the offenses charged. *Id.* at ¶ 51. The involuntary-manslaughter count alleged that E.S. caused the death of E.M. as a proximate result of E.S. having committed any of the offenses of having weapons while under disability, receiving stolen property, or improper handling of a firearm in a motor vehicle. Upon a de

novo review, I find the state presented sufficient evidence to demonstrate probable cause to believe E.S. committed this offense.

{¶ 49} M.W., who was a rear-seat passenger in the vehicle driven by E.M., testified that when the vehicle crashed, she experienced ringing in her ears. M.W. told a detective that she heard a loud bang, but she did not state it was from a gunshot and she did not see a gun. The three occupants immediately got out of the vehicle, with M.W. and E.S. fleeing from the passenger side. E.M., who exited the driver's door, was found on the ground a few feet away from the vehicle. The medical examiner concluded the cause of death was a gunshot wound to the chest and the manner of death was homicide. E.M. had been shot from a range of one to three feet away, and the bullet had entered his upper right chest and exited near his left armpit. A fired bullet was recovered from the interior driver's door, and a semi-automatic handgun, with one fired cartridge case still in the chamber and six live rounds, was recovered from underneath the front passenger seat. The handgun was forensically matched to the bullet lodged in the driver's door, and the bullet was identified as having been fired from the handgun. The location of the bullet was consistent with a path for the entry and exit wounds in E.M.'s body. E.S.'s DNA was found on the grip and trigger of the recovered handgun. No other bullets were recovered from the vehicle, and no bullets were found on the ground near the victim. There is no evidence to suggest M.W. fired the shot that killed E.M.

{¶ 50} Although no direct evidence was introduced to establish E.S. shot E.M., the state introduced circumstantial evidence from which one could infer this

was the case. Under Ohio law, a defendant may be convicted solely on the basis of circumstantial evidence. *State v. Nicely*, 39 Ohio St.3d 147, 151, 529 N.E.2d 1236 (1988), citing *State v. Kulig*, 37 Ohio St.2d 157, 309 N.E.2d 897(1974). "'[P]roof of guilt may be made by circumstantial evidence as well as by real evidence and direct or testimonial evidence, or any combination of these three classes of evidence. All three classes have equal probative value, and circumstantial evidence has no less value than the others. 1A Wigmore, Evidence (Tillers Rev. 1983) 944, Section 24 et seq.'" *Nicely* at 151, quoting *State v. Griffin*, 13 Ohio App.3d 376, 377, 469 N.E. 2d 1329 (1st Dist.1979). "'Circumstantial evidence is not less probative than direct evidence, and, in some instances, is even more reliable.'" *Id.*, quoting *United States v. Andrino*, 501 F.2d 1373, 1378 (9th Cir. 1974). Furthermore, that other evidence could have been collected or analyzed is immaterial to the analysis.

{¶ 51} To reach any conclusion other than finding that probable cause existed for involuntary manslaughter requires the majority to engage in a tortured effort to undermine the facts by engaging in speculative analysis precluded by Supreme Court precedent in probable-cause determinations for juvenile bindovers. The majority analysis runs counter to clearly established precedent.

{¶ 52} First, the state has no burden to disprove alternate theories of a case at a bindover proceeding. Second, the state's burden during a bindover hearing is not to establish guilt beyond a reasonable doubt, but to produce evidence that raises more than a mere suspicion of guilt. *In re A.J.S.*, 120 Ohio St.3d 185, 2008-Ohio-5307, 897 N.E.2d 629, at ¶ 42. Third, "the resolution of the conflicting theories of

the evidence, both of which were credible, is a matter for a trier of fact at a trial on the merits of the case, not a matter for exercise of judicial discretion at a bindover hearing in the juvenile court." *Id.* at ¶ 64, citing *State v. Iacona*, 93 Ohio St.3d 83, 96, 752 N.E.2d 937 (2001).

{¶ 53} To accept the trial court and majority's findings, one would have to conclude that Casper the unfriendly ghost was present in the vehicle at the time of the shooting. In an effort to bolster the one-line ruling of the trial court, the majority engages in unneeded credibility determinations and alternative "how it happened" theories while ignoring facts. In doing so, the majority opinion simply defers to the erroneous conclusion of the trial court by rationalizing the outcome through an improper analysis that should be reserved for a jury at trial.

{¶ 54} I find the testimony and evidence submitted at the bindover hearing raises more than a mere suspicion that E.S. committed the offense of involuntary manslaughter. Accordingly, I would reverse the decision of the juvenile court.