**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re E.S.*, Slip Opinion No. 2023-Ohio-4273.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2023-OHIO-4273

IN RE E.S.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re E.S.*, Slip Opinion No. 2023-Ohio-4273.]**

*Criminal law—Juvenile law—R.C. 2152.12—Juv.R. 30—Probable cause—The state's burden in establishing probable cause for purposes of binding a juvenile over to adult court is to produce evidence that raises more than mere suspicion of juvenile's guilt—Evidence presented by the state was sufficient to establish probable cause to believe that juvenile committed involuntary manslaughter—Court of appeals' judgment reversed and cause remanded to juvenile court.*

(No. 2022-0993—Submitted June 27, 2023—Decided December 1, 2023.)

APPEAL from the Court of Appeals for Cuyahoga County,

No. 110378, 2021-Ohio-4606.

_____

**DETERS, J.**

{¶ 1} In this appeal by the state of Ohio, we are asked to determine the quantum of evidence that satisfies the probable-cause standard for deciding whether a juvenile-court offender may be bound over to adult court. We reaffirm that the state's burden in that regard is to produce evidence that " 'raises more than a mere suspicion of guilt,' " *State v. Martin*, 170 Ohio St.3d 181, 2022-Ohio-4175, 209 N.E.3d 688, ¶ 19, quoting *State v. Iacona*, 93 Ohio St.3d 83, 93, 752 N.E.2d 937 (2001). To require more of the state is error.

{¶ 2} Following a car chase involving a stolen car, police discovered E.M., the driver of the stolen car, on the ground outside the car dead from a gunshot wound. A handgun was found under the car's front passenger seat, where appellee, E.S., then 16 years old, had been seated during the car chase. E.S.'s DNA accounted for most of the DNA that was found on the trigger and the grip of the gun, and a bullet that had been fired from the gun was found in the driver's side front door. E.S. was charged in juvenile court with multiple offenses relating to the stolen car, the gun, and E.M.'s death. Presented with this evidence, the juvenile court determined that although there was probable cause to believe that E.S. had possessed the gun found in the car while under a disability, *see* R.C. 2923.13(A)(2), had improperly handled the gun in the car, *see* R.C. 2923.16(B), and had received stolen property, *see* R.C. 2913.51(A), there was no probable cause to believe that E.S. had committed the involuntary manslaughter of E.M., *see* R.C. 2903.04(A), or the reckless homicide of E.M., *see* R.C. 2903.041(A).

{¶ 3} We conclude that the juvenile court improperly went beyond the role of gatekeeper for determining whether there was probable cause to believe that E.S. had committed the offenses and instead acted as the ultimate fact-finder. Because the evidence presented by the state was sufficient to establish more than a mere suspicion that E.S. committed involuntary manslaughter, we reverse the judgment of the Eighth District Court of Appeals affirming the juvenile court's probable-

cause determination regarding the involuntary-manslaughter charge,[1] and we remand this case to the juvenile court for further proceedings.

## BACKGROUND

**{¶ 4}** In July 2020, 16-year-old E.S. was charged in Cuyahoga County juvenile court with involuntary manslaughter, reckless homicide, having a weapon while under a disability, receiving stolen property, and improperly handling a firearm in a motor vehicle. The involuntary-manslaughter, reckless-homicide, and receiving-stolen-property charges included firearm specifications. The charges arose from an incident during which E.S.'s friend, E.M., was killed by a gunshot wound to his chest.

**{¶ 5}** The state filed a notice of mandatory bindover to adult court, *see* R.C. 2152.10(A)(2), and a motion requesting that the juvenile court relinquish jurisdiction over the case, *see* R.C. 2152.10(B) and Juv.R. 30(A). The juvenile court held a hearing to determine whether there was probable cause to believe that E.S. had committed the offenses charged. *See* Juv.R. 30(A). The following evidence was presented during the probable-cause hearing.

**{¶ 6}** At around 5:15 a.m. on June 9, 2020, Cuyahoga Heights Police Officer Kevin Stack saw a silver car being driven in a 35 m.p.h. zone at a high speed. Officer Stack and his partner, Cuyahoga Heights Police Officer Matthew Kontura, followed the car in their police cruiser and eventually learned that the car had been reported stolen and had been involved in an attempted robbery. In light of that information, the officers attempted to initiate a stop of the car by turning on their cruiser's siren and overhead lights. The car did not stop, and a chase ensued.

**{¶ 7}** At some point, the chase proceeded into a field. Although the fleeing car was being driven quickly through the field, the police officers pursued it slowly because it was still dark outside and visibility was further diminished because the

---

1. The state has not challenged on appeal the juvenile court's determination that there was no probable cause regarding the reckless-homicide charge.

fleeing car was sending dust into the air. When the officers were about 500 feet behind the car, Officer Stack "saw the [car] kind of tilt forward and stop."

{¶ 8} The officers continued to move toward the stopped car. As Officer Stack got out of the cruiser to approach the car, he saw a black male and a black female climbing up the embankment near where the car had crashed into a ditch. Officer Kontura pursued the male and the female on foot while Officer Stack went to the car to confirm that no one else was in it. He observed that the two passenger-side doors were open and that the driver's side front door was closed. Officer Stack went to the driver's side of the car to turn the car off.

{¶ 9} After "clearing" the car and turning its engine off, Officer Stack attempted to use the police cruiser to join Officer Kontura in his pursuit of the male and the female. However, he was unable to drive the cruiser across the ditch, so he walked back to the scene of the crash to attempt to follow his partner on foot. He then saw a black male, who was later determined to be E.M., lying face down on the ground near the car. Officer Stack drew his weapon and issued verbal commands, but E.M. did not respond.

{¶ 10} During the car chase, Officer Stack told the police dispatcher for his department to notify the Cleveland Police Department of the location where he and Officer Kontura were pursuing the car. Cleveland Police Department Detective Samuel Pelsnik, who was a patrol officer at the time of the incident, testified that he arrived at the scene about 30 seconds after Officer Stack discovered E.M. on the ground. Detective Pelsnik described having seen Officer Stack standing with his gun drawn about ten feet from a man (E.M.) who was lying face down on the ground. E.M. was about 20 feet in front of the crashed car. The detective recounted, "I went over to the male. I asked [Officer Stack] if he needed assistance detaining the male. He said yes." Detective Pelsnik explained that he approached E.M. and determined that he was unresponsive. He then rolled E.M. over and began to perform CPR on him. Detective Pelsnik testified that when he and Officer Stack

lifted E.M.'s shirt, he saw that E.M. had been shot. The attempt at CPR was unsuccessful.

{¶ 11} Cleveland Police Department Detective David Arkley, who also arrived at the scene soon after the crash, testified that he examined the Cuyahoga Heights police officers' guns and their magazines at the scene and determined that no ammunition was missing from them. Cleveland Police Department Homicide Unit Detective Raymond Diaz also examined the Cuyahoga Heights officers' guns and determined that no rounds had been fired from them.

{¶ 12} The car E.M. had been driving was taken to a police impound lot, where it was later processed by Cleveland Police Department Detective Tommy Manson. Detective Manson testified that a fired bullet was recovered from inside the driver's side front door. Also, a 9 mm handgun with one fired cartridge case and six live rounds was recovered from under the front passenger seat.

{¶ 13} Jeffrey Oblock, a DNA analyst with the Cuyahoga County Regional Forensic Science Laboratory, testified about DNA evidence. A swab of the trigger and the grip of the gun found in the car contained a mixture of DNA from five contributors. According to Oblock, "[a] match" was identified between the DNA in the swab and E.S.'s DNA that was "51.8 quintillion times more probable than a coincidental match to an unrelated African American person, 82.2 sextillion times more probable than a coincidental match to an unrelated Caucasian person, and 14.1 sextillion times more probable than a coincidental match to an unrelated Hispanic person." Oblock further testified that "match support for [E.M.] to [the DNA in the swab was] inconclusive and no statistical support for a match was identified between [the DNA in the swab] and [the female who had fled the car]." Oblock further opined, "Likely in this case the majority of that DNA was [E.S.'s]." And he testified that E.S.'s DNA had probably been on the trigger and the grip of the gun because of primary transfer of the DNA, which occurs when "an individual directly leaves [his or her] DNA onto an item."

{¶ 14} Kristin Koeth, a firearm and toolmark examiner with the Cuyahoga County Regional Forensic Science Laboratory, testified about her analysis of the fired bullet that was found in the driver's side front door of the car, a bullet fragment that was found in the car, and the handgun and cartridge case that were found in the car. She concluded that the fired bullet and the cartridge case had been fired by the gun that was found under the front passenger seat but that the bullet fragment had not been fired by that gun.

{¶ 15} Dr. Elizabeth Mooney, who performed the autopsy on E.M., testified that E.M. died from a gunshot that had entered his upper right chest just below the collarbone and exited his upper left back near the armpit. Dr. Mooney opined that based on the gunpowder stippling found on E.M.'s body and the lack of soot on E.M.'s body, the gun that fired the bullet had been at least a foot away from E.M. when it was fired. She explained that it would take "some time" for a person with such a gunshot wound to lose consciousness, but "not more than a minute * * * or so."

{¶ 16} M.W. was identified as the female who ran from the stolen car after it crashed. She testified that E.M. and E.S. were giving her a ride home from a party when the police chase started. She confirmed that E.M. was driving the car. When asked whether she heard anything when the crash occurred, she testified that "[i]t was like a crash" and that she heard a ringing noise. This testimony differed from the statement she had given to Detective Diaz, who testified that M.W. had told him that "there was a loud bang." According to M.W., E.M. exited the car from the driver's side front door at the same time that she and E.S. exited from the passenger-side doors but that E.M. had run in the opposite direction of her and E.S. M.W. stated that she never saw a gun in the car.

{¶ 17} Throughout the probable-cause hearing, the juvenile-court judge actively questioned many of the state's witnesses and seemed skeptical about the police investigation regarding the incident. For example, when Detective Diaz

suggested during his testimony that the fired bullet's having been found in the driver's side front door was consistent with E.M.'s having been shot while in the driver's seat, the court interjected, "Really?" The court again interjected, "Excuse me. Really? Upper chest, comes out his armpit, but the bullet defect is on the top of the door above the exit handle and the window. Was he standing up in the car?" When Detective Diaz responded, "I don't know that, ma'am," the court asked, "Seriously, Detective, what's your theory? Was he standing up in the car?" Likewise, the court seemed very concerned that the car had not been processed for gunshot residue, and it questioned Detective Manson about why no effort had been made to do so.

{¶ 18} Following the probable-cause hearing, the juvenile court issued a decision finding that the state had not established probable cause to believe that E.S. had committed involuntary manslaughter or reckless homicide. However, the court found that there was probable cause to believe that E.S. had committed the remaining offenses—having a weapon while under a disability, receiving stolen property, and improperly handling a firearm in a motor vehicle.

{¶ 19} The state appealed the juvenile court's judgment to the Eighth District, arguing that the juvenile court had erred by finding that there was no probable cause to believe that E.S. had committed involuntary manslaughter. In a two-to-one decision, the court of appeals affirmed the juvenile court's judgment. 2021-Ohio-4606, ¶ 41-44. Like the juvenile-court judge, the court of appeals' majority expressed skepticism about the state's investigation, stating, "While it is credible evidence that E.S.'s DNA was on [the gun found in the car], the evidence also shows there were four other individuals' DNA present there as well. And while the state made sure to test to see whether E.M.'s or M.W.'s DNA was a match, they did not attempt to match anyone else's DNA," *id.* at ¶ 37. The court noted, "Even more strikingly," the bullet that was found in the driver's side front door was never tested to determine whether it had E.M.'s DNA on it and that "[s]imilarly, the state

failed to swab the vehicle for gunpowder residue to at least firmly establish the firearm was discharged in the vehicle." *Id.* at ¶ 38.

{¶ 20} We accepted the state's appeal to consider the following proposition of law:

> In a juvenile bindover probable cause hearing, circumstantial evidence is entitled to the same weight as direct evidence in determining whether there is probable cause and a reviewing court should examine the evidence and inferences in a light most favorable to the prosecution.

*See* 168 Ohio St.3d 1418, 2022-Ohio-3752, 196 N.E.3d 853.

## ANALYSIS

{¶ 21} Under Ohio's statutory scheme, a juvenile's case is subject to mandatory or discretionary transfer to adult court if certain elements are met. R.C. 2152.10. But before a juvenile court may transfer a case to adult court, it must determine whether there is probable cause to believe that the juvenile committed the offense or offenses charged. R.C. 2152.12; Juv.R. 30(A).

### *Probable cause in juvenile cases*

{¶ 22} This court recently clarified what is required to establish probable cause. *See Martin*, 170 Ohio St.3d 181, 2022-Ohio-4175, 209 N.E.3d 688. "The substance of all the definitions of probable cause is a reasonable ground for belief of guilt. Thus, probable cause exists when the facts and circumstances are sufficient to provide a reasonable belief that the accused has committed a crime. The inquiry requires the judge to review all the circumstances and make a practical, common-sense decision as to whether probable cause is present." (Cleaned up.) *Id.* at ¶ 17.

{¶ 23} In the context of establishing probable cause for purposes of binding a juvenile over to adult court, "[t]he state must provide credible evidence of every

8

element of an offense to support a finding that probable cause exists to believe that the juvenile committed the offense." *Iacona*, 93 Ohio St.3d 83, 752 N.E.2d 937, at paragraph three of the syllabus. At the probable-cause stage of the proceedings, the state need not prove a juvenile's delinquency beyond a reasonable doubt; instead, the state's burden is to produce evidence that " 'raises more than a mere suspicion of guilt,' " *Martin* at ¶ 19, quoting *Iacona* at 93. There is no additional burden on the state "to disprove alternate theories of the case at a bindover proceeding." *In re A.J.S.*, 120 Ohio St.3d 185, 2008-Ohio-5307, 897 N.E.2d 629, ¶ 61, citing *Iacona* at 96. Nor is there an obligation on the state's part "to marshal all of its evidence at the probable-cause phase." *Martin* at ¶ 30.

{¶ 24} In *Martin*, we also addressed the juvenile court's role in determining whether the state presented sufficient evidence to support a finding of probable cause. We concluded that the juvenile court's assessment of the credibility of the state's evidence is "entitled to deference on review" but that "the juvenile court 'is not permitted to exceed the limited scope of the bindover hearing or to assume the role of the ultimate fact-finder.' " *Id.* at ¶ 23, quoting *A.J.S.* at ¶ 44. "Rather, it is tasked only with determining whether the state presented sufficient credible evidence of probable cause, and that determination is reviewed de novo." *Id.* at ¶ 24.

### *Probable cause to believe that E.S. committed involuntary manslaughter*

{¶ 25} E.S. was charged with involuntary manslaughter in violation of R.C. 2903.04(A), which provides, "No person shall cause the death of another * * * as a proximate result of the offender's committing or attempting to commit a felony." "[R.C. 2903.04(A)] requires two things for an involuntary-manslaughter conviction: (1) that a felony was committed and (2) that a person's death was a proximate result of the commission of that felony." *State v. Crawford*, 169 Ohio St.3d 25, 2022-Ohio-1509, 201 N.E.3d 840, ¶ 14.

**{¶ 26}** According to the juvenile complaint against E.S., the state alleged that E.M.'s death was the proximate result of at least one of three felonies committed by E.S.: (1) improper handling of a firearm in a motor vehicle, (2) having a weapon while under a disability, or (3) receiving stolen property. The juvenile court concluded that there was probable cause to believe that E.S. had committed the three underlying felonies, so the question is whether there was probable cause to believe that E.M.'s death was the proximate result of E.S.'s commission of at least one of those felonies. *See* R.C. 2903.04(A).

**{¶ 27}** Here, the state presented sufficient evidence raising more than a mere suspicion that E.M.'s death was the proximate result of E.S.'s having had a weapon while under a disability or having improperly handled that weapon while in the stolen car. The state presented evidence during the probable-cause hearing showing (1) that the gun that was the basis of the weapons-under-disability and improper-handling charges was found under the front passenger seat where E.S. had been seated during the car chase, (2) that E.S.'s DNA accounted for most of the DNA found on the trigger and the grip of that gun, (3) that a bullet that had been fired from that gun was found in the driver's side front door, (4) that E.M. had been in the driver's seat when the car crashed, (5) that the location of the bullet found in the door was consistent with E.M.'s having been shot while he was seated in the driver's seat, and (6) that E.M. died from a gunshot wound. The state's case was built, in part, on circumstantial evidence, but " 'circumstantial evidence has no less value than [direct or testimonial evidence],' " *State v. Nicely*, 39 Ohio St.3d 147, 151, 529 N.E.2d 1236 (1988), quoting 1A Wigmore, *Evidence*, Section 24, at 944 (Tillers Rev.1983).

**{¶ 28}** The juvenile court's summary decision does not explain why the court did not find probable cause regarding the involuntary-manslaughter charge. However, the court's questions and statements during the probable-cause hearing give some insight on how it reached that conclusion, and they suggest that the court

10

improperly expected the state "to disprove alternate theories of the case," *A.J.S.*, 120 Ohio St.3d 185, 2008-Ohio-5307, 897 N.E.2d 629, at ¶ 61, and "marshal all of its evidence at the probable-cause phase," *Martin*, 170 Ohio St.3d 181, 2022-Ohio-4175, 209 N.E.3d 688, at ¶ 30. The court seemed troubled that the state had not ruled out other possible causes of E.M.'s death—even going so far as to insinuate during the hearing that the Cuyahoga Heights police officers could have been responsible, despite the state's having presented undisputed testimony from Detectives Arkley and Diaz that the officers' guns had not been fired. The court also expressed concern that there had been no processing of the car for gunshot residue and that the bullet that was retrieved from the driver's side front door had not been tested for the presence of DNA. The court's questions and statements in that regard illustrate that it was functioning not as a gatekeeper for determining whether there was probable cause but rather as the ultimate fact-finder. This was error.

**{¶ 29}** While the juvenile court's reasons for its determination that there was no probable cause to believe that E.S. had committed involuntary manslaughter must be gleaned from the court's questions and statements during the hearing, the court of appeals' decision lays bare its errors in reviewing the juvenile court's judgment. In the court of appeals' decision, the majority questions why the state did not "attempt to match anyone else's DNA" to the DNA on the firearm, 2021-Ohio-4606 at ¶ 37, and why the bullet that was found in the driver's side front door was not tested for DNA, *id.* at ¶ 38. And the court takes the state to task for having failed to process the stolen car for gunshot residue "to at least firmly establish the firearm was discharged in the vehicle." *Id.* But at the probable-cause stage of the proceedings, the state was not required to eliminate any alternative theories or to "firmly establish," *id.*, any fact. The court of appeals erred when it determined that the state's evidence was insufficient to establish probable cause regarding the involuntary-manslaughter charge.

**CONCLUSION**

**{¶ 30}** Both the juvenile court and the court of appeals held the state to a burden not required for the purpose of establishing probable cause in a bindover proceeding. The evidence presented by the state—both circumstantial and direct— was sufficient to establish probable cause to believe that E.S. had committed the offense of involuntary manslaughter. We therefore reverse the judgment of the Eighth District Court of Appeals and remand the case to the juvenile court for further proceedings consistent with this opinion.

Judgment reversed

and cause remanded.

KENNEDY, C.J., and FISCHER, DEWINE, DONNELLY, STEWART, and BRUNNER, JJ., concur.

———————————

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Daniel T. Van, Eben McNair, and Gregory Ochocki, Assistant Prosecuting Attorneys, for appellant.

Timothy Young, Ohio Public Defender, and Timothy B. Hackett, Assistant Public Defender, for appellee.

Dave Yost, Attorney General, Michael J. Hendershot, Chief Deputy Solicitor General, and Samuel C. Peterson, Deputy Solicitor General, urging reversal for amicus curiae, Ohio Attorney General Dave Yost.

———————————